# EXHIBIT "A"

# IN THE SUPERIOR COURT FOR THE DISTRICT OF COLUMBIA CIVIL DIVISION

Kevin Bushrod

2840 Langston pl

Washington ,DC 20020



    Plaintiff;

    v.

THE DISTRICT OF COLUMBIA

SERVE:

HON. Muriel Bowswer Mayor

The District Building

1350 Pennsylvania Ave. NW

Washington ,DC 20004


Karl A. Racine

Attorney General, DC

441 4TH ST NW.

Washington , DC 20001

      And

OFFICER ZACHARY BLIER

Individually and in his
official capacity

District of Columbia Police
Department

5th District Police Station

Washington ,DC 20018

CIVIL ACTION NO.

17- 0006188

# Complaint

### (Aggravated Assault, Libel, Slander, Negligent Supervision)

---

## INTRODUCTION

1. This is a civil action alleging intentional misconduct and negligence on the part of the District of Columbia, and one member of the Metropolitan Police Department when it assaulted, arrested, imprisoned, maliciously prosecuted libel and slandered the plaintiff, a District of Columbia resident. The action seeks both compensatory and punitive damages against the defendants for the intentional acts of wrongdoing.

## JURISDICTION

2. This court has original jurisdiction subject matter over this case by virtue of District of Columbia Code 11-921 and personal jurisdiction over all defendants by virtue of District of Columbia Code 12-334.

## PARTIES

3. Plaintiff, Kevin Bushrod, was at all times relevant herein, a resident of the District of Columbia and a Citizen of the United States.

4. Defendant District of Columbia is a municipal corporation and at all times herein was responsible for the actions of the members of its Police Department.

5. Defendant Zachary Blier is a Metropolitan Police Officer, and was so at all times herein relevant. He is being sued in both his individual and official capacities.

## STATEMENT OF FACTS

6. On September 10, 2014 the plaintiff was driving his vehicle when he was stopped by Officer Blier. Due to traffic conditions the plaintiff was not able to use the far right lane to pull over; the plaintiff proceeded to pull over as Officer Blier approached the plaintiff's vehicle, service weapon drawn, wherein, defendant Blier who was on duty at the time, discharged his service weapon striking the plaintiff with deadly force in his left shoulder.

7. Even though the plaintiff placed both hands on the steering wheel of his vehicle and did not present a threat, the defendant raised his firearm to the plaintiffs face, inches away, misusing his authority as a Metropolitan Police Officer

8. After the defendant had stopped the plaintiff without incident during a routine traffic stop, Officer Blier, without having any present threat shot the plaintiff as he drove away in duress.

9. At the time the defendant shot the plaintiff he had no lawful authority to do so as there had been no present threat of any kind, nor did Blier have any probable cause to believe the plaintiff had any weapon in his possession.

> The defendant discharging his service weapon striking the plaintiff was indeed aggravated assault. Furthermore the plaintiff was arrested, imprisoned and subjected to a malicious prosecution against what the facts supported. Not surprisingly, the plaintiff was acquitted on or about January 28, 2015 of ASSUALT ON A POLICE WHILE ARMED AND ASSUALT WITH A DANGEROUS WEAPON, as there was no basis in fact for the bogus charge in the first place.

10. The plaintiff was treated for a gunshot wound to the left shoulder at Medstar Washington Hospital Center Orthopedic Surgeons in the Emergency Room and discharged after 2 days hospitalization and non-surgical treatment. The palkintiff was then taking to Metropolitan Police department 5th district for questioning with orthopedic surgeon prescribed pain medication for his gunshot wound on September 12, 2014.

11. After being made aware of the plaintiffs medical condition and given prescription medication from plaintiff property, Officers at MPD 5TH district refused plaintiff both the orthopedic surgeon pain medications as well as water. Plaintiff was forced to drink water from a cell toilet to prevent from going into shock from dehydration as a last course of action. Medical records will reflect dates of treatment.

12. The plaintiff was later transported to DC Central Cell Block for processing after having hours been denied the pain medication from Medstar Washington Hospital Center for his gunshot wound. On September 13,2014 the plaintiff went into shock from pain in left shoulder gunshot wound and was rushed back to Medstar Washington Hospital Center to be treated again for pain.

13. In addition, while in the District of Columbia custody the plaintiff was transported from the Central Detention Facility to the Superior Court House on November 21,2014 and was left outside in below freezing temperatures without a coat, after being told "we don't have anymore". The District of Columbia employees were gone approxiamately 40 minutes before returning only to not have right key to get plaintiff out of transport van. Additional time was the forced upon the plaintiff to be in the freezing temperatures while employees scrambled to find the keys.

14. At all times relevant to this action, the District of Columbia had in effect and was responsible for the policies and procedures followed by the Police officer and the employees if the District in the actions relating to the plaintiff

## COUNT I

### (Aggravated Assault)

<u>15.</u> Plaintiff incorporates by reference paragraphs 1 through 14 as if fully set forth herein.

<u>16.</u> On the above referenced date and time defendants District of Columbia and Zachary Blier wrongfully and unlawfully assaulted the plaintiff. The plaintiff committed no act against either defendant or any other party to subject him to be assaulted, libel or slandered.

<u>17.</u> As a direct and proximate result of the assault , libel and slander of the plaintiff by the defendants , the plaintiff suffered a completely shattered humerus bone (shoulder), discomfort and distress and will continue to suffer psychological harm and mental anguish including fright , mortification, shame, humiliation, embarrassment, and range of motion in his left shoulder. Also the indignity and disgrace of being accused of assaulting a policemen and being grossly mistreated.

> WHEREFORE, the plaintiff, demands judgment against the defendants, jointly and severally, in the full and just amount of Three Million Dollars ($3,000,000.00), in compensatory damages, punitive damages against defendant Zachary Blier in the amount of one Million Dollars ($1,000,000.00) plus interests and costs.

## COUNT II

### (Libel)

<u>18.</u> Plaintiff incorporates, by reference, paragraphs 1 through 14, as if fully set forth herein.

<u>19.</u> Defendant District of Columbia, having arrested and detained the plaintiff for the prosecution of alleged "Assault with a Dangerous Weapon", " Assault on Police while Armed" caused Libel even they knew there was no basis for the charges that existed.

<u>20.</u> A trial on the false and baseless charges was schedules in the Superior Court of the District Of Columbia in January 2015, at which the plaintiff was acquitted of the lodged charges.

<u>21.</u> As  direct and proximate result of the Libel of the plaintiff by the defendants , the plaintiff has suffered discomfort, loss of employment, loss of future wages, and will continue to suffer psychological harm and mental anguish, including shame, humiliation, embarrassment, and disgrace of libel through various media outlets originating from court documents filed against the plaintiff.

> WHEREFORE, the plaintiff, demands judgment against the defendants, jointly and severally, in the full and just amount of Three Million Dollars ($3,000,000.00) in compensatory damages, punitive damages against defendant Zachary Blier in the amount of one Million Dollars ($1,000,000.00) plus interests and costs.

## COUNT III
## (Slander)

22. Plaintiff hereby incorporates, by reference, paragraphs 1 through 14 as if fully set forth
    herein.

23. Plaintiff further allege defendants District of Columbia and Zachary Blier with deliberate
    indifference and reckless regard for the rights for the plaintiff with pure malice did make
    various statements on the public record in order to justify the egregious allegations
    made against the plaintiff. Defendant District of Columbia, with full knowledge of the
    witness statements within the police report continued the malicious prosecution and
    slander of the plaintiff during the jury trial during January 2014.

24. As a direct and proximate result of the actions of the defendants, the plaintiff suffered
    discomfort, mental anguish, intensified psychological harm, shame, humiliation, and
    embarrassment from the indignity and discgrace of being verbally abused, grossly
    mistreated and slandered publicly.

> As a further direct and proximate result of the actions of the defendants, the
> plaintiff will continue to suffer embarrassment, humiliation, severance from
> communal ties and social anxiety.
> WHEREFORE , then plaintiff, demands judgement against the defendants, jointly
> and severally, in the full amount of Three Million Dollars ($3,000,000.00), in
> compensatory damages , punitive damages against defendant Blier in the
> amount of one Million Dollars ($1,000,000.00) plus interests and costs.

## COUNT IV
## (Negligent Supervision)

25. Plaintiff incorporates by reference, paragraphs 1 through 14 as if fully set forth herein.

26. At all times relevant herein, the defendant officer Blier was acting under the direction
    and control , and pursuant to the rules, regulations, policies and procedures, of
    defendant District of Columbia.

27. Defendant District of Columbia acted negligently and careless and recklessly by failing to
    properly train, supervise, control, direct and monitor the defendant officer. Defendant
    District of Columbia , with full knowledge of Defendant Bliers actions has not taken any
    disciplinary action against him and has therefore acquiesced in and/or condoned Blier in
    his actions against the Plaintiff.

28. As a direct and proximate result of the acts and omissions of defendant District of
    Columbia, plaintiff was assaulted with a deadly weapon with deadly force, suffered libel
    and slander. As a result the plaintiff has suffered permanent physical injuries, mental
    anguish and emotional distress. WHEREFORE, the plaintiff, demands judgement against

the District of Columbia in the full and just amount of Three Million Dollars ($3,000,000.00) in compensatory damages plus interests and costs.

## JURY DEMAND

## The Plaintiff demands a trial by jury on issues so triable.

9/7/17

# EXHIBIT "B"

**IN THE SUPERIOR COURT FOR THE DISTRICT OF COLUMBIA**
**CIVIL DIVISION**

KEVIN BUSHROD, JR.,

        Plaintiff,

v.

DISTRICT OF COLUMBIA;
ZACHARY BLIER, an officer
of the D.C. Metropolitan
Police Department, in his
individual capacity; and
PETER NEWSHAM, Chief
of the D.C. Metropolitan Police
Department, in his individual
capacity,

        Defendants.

No. 2017 CA 6188 B

Hon. Brian F. Holeman, Judge

**Jury trial demanded**

**FIRST AMENDED COMPLAINT**
**FOR DECLARATORY, INJUNCTIVE AND MONETARY RELIEF**

*Introduction*

1.    This civil action under D.C. and federal law seeks redress for gunshot injuries to an unarmed and non-violent African American man, Kevin Bushrod, Jr., inflicted by a white D.C. Metropolitan Police ("MPD") officer named Zachary Blier (pron. "BLY-er"), who in a few moments on August 14, 2014, turned a traffic stop in northeast D.C. into a classic scene of police brutality. Blier had good reason to know that Bushrod was unarmed and had no intent to harm anyone, but shot him anyway, then charged that Bushrod had intentionally "assaulted" him with a "deadly weapon"—his car, which had stalled in a rush-hour intersection and was immobilized against a curb. Bushrod was acquitted of the felony assault charge in this Court in 2015; prosecutors were able to convince the jury only that Bushrod had

resisted arrest, not that he intended to hurt anyone. But Bushrod was seriously wounded by Blier's unconscionable gunshot, which has caused him permanent physical damage and other enduring harms, and he now seeks to hold Blier, MPD and the District accountable for the violence that was done him.

### Parties and jurisdiction

2.  Plaintiff Kevin Bushrod, Jr., 27 years old at the time of the incident, is a citizen and resident of the District of Columbia.

3.  Defendant District of Columbia ("District" or "D.C.") is a municipal corporation, the local government of Washington, D.C. It operates and governs the D.C. Metropolitan Police Department ("MPD") pursuant to the laws of the District of Columbia. In this case, the District acted through its agents, employees, and servants, including the individual defendants.

4.  Defendant Peter Newsham is Chief of the D.C. Metropolitan Police, and is responsible for all MPD policies regarding the use of force by its personnel. Mr. Newsham has also headed MPD's Internal Affairs Bureau, a management position that bore responsibility for investigations of misconduct by MPD personnel, including the use of excessive force, and for the success or failure of MPD policies governing police misconduct, including, *inter alia*, the unnecessary discharge of firearms. At the time of the 2014 incident at the center of this suit, Mr. Newsham was assistant chief of police in charge of MPD's Investigative Services Bureau. At all times relevant to this suit, Mr. Newsham was acting within the scope of his employment and under color of D.C. law. He is sued in his individual capacity.

5.  Defendant Zachary Blier is a sworn officer of the D.C. Metropolitan Police. At all times relevant to this suit, he was acting within the scope of his employment and under color of D.C. law. He is sued in his individual capacity.

6.     This Court's civil jurisdiction is properly invoked under D.C. Code § 11-921(a)(6), as the plaintiff is a resident of the District of Columbia, the wrongs complained of occurred in the District of Columbia, the municipal defendant is the District of Columbia, and the individual defendants are officers of the D.C. government.

*Background of the incident at issue*

7.     Kevin Bushrod, Jr., now 31 years old, is a tall, thin and gentle young man, 6'5" in height, who was a college basketball star with viable professional prospects before defendant Blier shot him.

8.     Bushrod attended Washington Bible College, in Greenbelt, Maryland, now part of Lancaster Bible College, a Christian religious college and seminary and NCAA Division III basketball school, where he studied theology and played on the varsity basketball team as a standout shooting guard.

9.     Mr. Bushrod was born and raised in D.C., and lives in the District today. He is an iron worker and a member of Local 5 of the International Iron Workers' Union. He is engaged to be married; his fiancée, an electrical engineer, is an information technology and cybersecurity professional in the federal government.

10.     Mr. Bushrod owns a dark blue full-size 1994 Ford Crown Victoria four-door sedan, in fair condition, that long ago was a police cruiser. The car no longer has any police markings, emergency lights, siren, police radio or antennae, or police-specific interior fittings or accessories.

11.     The car is nevertheless conspicuous to police because of its obvious resemblance to cars used by law enforcement, and the plaintiff is informed and believes that police have a prejudice against private citizens' ownership of former police cruisers for this reason.

12.     Sometime in 2014, Mr. Bushrod's D.C. driver's license was suspended, without his knowledge, because of unpaid penalties on old unpaid traffic and/or parking tickets on the Crown Victoria, almost all of which were incurred when the car was in someone else's custody and he was not receiving mail sent to his address of record.

13.     On or about August 7, 2014, Mr. Bushrod, who by this time had resumed possession of the Crown Vic, ventured outside his home to move the car across the street because of parking restrictions.

14.     Mr. Zachary Blier, a young D.C. Metropolitan Police officer in his 20s with five years or fewer of police experience, happened to be passing by in a police cruiser at just the right moment, saw the Crown Victoria with Mr. Bushrod, visibly African American in race, at the wheel, and chose to check the car's license tags for validity.

15.     Blier pulled the Crown Victoria over, questioned Mr. Bushrod, took and checked his driver's license, and discovered it had been suspended—something Bushrod himself did not know.

16.     Blier's attitude toward Bushrod immediately and drastically changed. On his return to Bushrod's car, Blier barked, "You're going to jail!" His manner became extremely aggressive. He ordered Bushrod out of the car, refused to hear a word from him, arrested and handcuffed him with sudden and extreme movements, shoved him into the back of the squad car, and drove him to the MPD Fifth District headquarters on Bladensburg Road, N.E., where he was charged with invalid tags and driving on a suspended license. The judicial officer on duty understood, even without counsel present, that Bushrod posed no threat to public safety, and released him on his own recognizance. The charges were later dismissed in their entirety.

17.     Throughout the August 7 traffic stop, Bushrod was unarmed, completely docile and cooperative, complied at all times with Blier's instructions, and was never loud, angry, hostile or belligerent, regardless of how extreme Blier's behavior became.

18.     Two days after Bushrod's arrest, on August 9, 2014, the nation was convulsed by a white policeman's fatal shooting of a black teenager on a residential street in Ferguson, Missouri, rocketing white-on-black police violence to the forefront of the nation's consciousness and exacerbating tensions between white police and black citizens across the country.

19.     For a few moments on the evening of September 4, 2014, a few weeks after the police shooting in Ferguson, Mr. Bushrod walked out to his car, parked in a private church parking lot near his home with the church's permission, to retrieve some personal effects. Officer Blier and his patrol car partner, Officer Gregory Collins, another D.C. Metropolitan Police officer in his 20s with about five years' experience, passed by on patrol at that very moment and saw and recognized Bushrod's car, its engine not running, its lights off, and apparently saw him inside. Mr. Bushrod had the church's permission to leave his car there, but the officers came into the parking lot, came up to the car, questioned him on what he was doing there, and made plain they regarded him as suspicious, before leaving him alone.

20.     A week later was the incident that gave rise to this lawsuit.

### Events of the incident at issue

21.     On September 10, 2014, a hot summer day, at about 5:30 p.m., Mr. Bushrod was driving the old Crown Victoria slowly northwest in clogged afternoon rush-hour traffic on South Dakota Avenue, N.E., in the District, about a half mile southeast of its intersection with Bladensburg Road, N.E., and a few blocks from his home. Blier happened to be driving his Chevrolet police cruiser on South Dakota Avenue at that very hour, and either he or his

partner, Officer Collins, saw and recognized Bushrod's car and, on information and belief, Bushrod himself.

22.    Mr. Bushrod, who had seen the police car, turned left off South Dakota Avenue onto a quiet residential side street with speed bumps. He was not speeding, and the speed bumps kept his speed low. At the end of the first block of that side street he turned right, heading north, and then took the first right turn, now heading east, back toward South Dakota Avenue a block away.

23.    Meanwhile, Blier made the same left turn off South Dakota Avenue, following where Bushrod had gone, even though MPD policy forbade pursuits in such tame circumstances. Blier kept his cruiser's lights and siren off, pretending to comply with the no-pursuit policy, and intending to startle and intimidate him upon catching up with him.

24.    Mr. Bushrod reached South Dakota Avenue and began a slow left turn to the northwest, once again into heavy and slow-moving rush hour traffic on South Dakota Avenue, attempting to squeeze past one or more cars that were stopped in the southeast-bound lanes and partially blocking the intersection.

25.    At that moment Blier's cruiser pulled up immediately behind him, in the intersection.

26.    Just as the police car came to a stop immediately behind Mr. Bushrod's car, the right front wheel of the Crown Victoria became stuck on or against the curb of the South Dakota Avenue median. The Crown Victoria stalled. Mr. Bushrod turned off the ignition.

27.    A mechanical quirk of the Crown Victoria at the time of this incident was that its ignition apparatus no longer worked properly, and the engine would not start unless the gearshift was in neutral.

28.     The following paragraphs, through ¶ 37, describe what happened over the next approximately ten to twenty seconds.

29.     Officers Blier and Collins got out of the Chevrolet cruiser on their respective sides. One or both men drew their guns, and each raced forward toward his side of Bushrod's Crown Victoria. Bushrod remained perfectly still at the wheel of the Crown Vic.

30.     As Blier ran toward the Crown Victoria with his gun drawn, he screamed at Bushrod, savagely, more than once, "GET THE FUCK OUT OF THE CAR!!"

31.     Blier's adrenaline, as he later admitted, was pumping furiously, even though Bushrod's stalled car was going nowhere, no show of force or arms had come from the Crown Vic, and there was no other actual threat of physical violence.

32.     Officer Blier, gun drawn in his right hand, finger on the trigger, grabbed the driver's door handle of the Crown Victoria with his left hand and flung the door open with great force.

33.     Blier then violently pushed himself into the car, shoving his body on top of Bushrod's forearms, which were frozen in a frightened grip on the stalled car's steering wheel.

34.     With his body on top of Bushrod's, Blier began trying—with his left hand, while the gun was drawn and ready to fire in his right—either to grab one of Mr. Bushrod's arms or to yank the keys out of the stalled Crown Vic's ignition, or both.

35.     Mr. Bushrod, terrified of what Blier might do with the gun in his hand, unthinkingly tried to start the Crown Victoria, an action which, due to the mechanical problem described above, required moving the gearshift upward from drive to neutral before turning on the ignition, and then pulling the gearshift either upward into reverse or downward into drive after the engine started.

36.    Blier straightened up and backed out of the Crown Vic just as Bushrod was starting the ignition.

37.    A moment later, as Bushrod managed to get the car into gear and tried to dislodge the Crown Vic from the curb, Blier fired his gun at Bushrod, without warning, from three feet away, just outside the wide-open driver's door, and blasted a bullet into Bushrod's left shoulder.

### Impact of the shooting

38.    Emergency surgery was able to remove pieces of the shattered bullet from Bushrod's body, and to save his left arm from possible amputation, but fragments of bullet and bone remain lodged in Bushrod's left shoulder and chest to this day, removal of which is deemed medically unsafe because of the risk of nerve, muscle or blood vessel damage, paralysis, necrosis, or other sequelae, any of which could cause the patient still greater pain, render the arm almost or completely useless, or require its amputation.

39.    As a result of Blier's gun attack, Bushrod suffered tremendous and lasting physical and emotional pain, psychological trauma, terror, anxiety and depression, not attributable to any other life experience, and for which he sought, still receives, and will continue for the rest of his life to receive medical attention.

40.    As a result of Blier's gun attack, the range of motion and the muscle strength in Bushrod's left arm and shoulder, his neck, and his upper torso have been sharply and permanently reduced despite years of physical therapy.

41.    As a result of Blier's gun attack, Bushrod's ability to engage in certain physical activities, to be proven at trial, has been significantly limited, thus reducing his earning capacity and quality of life, both occupational and personal.

42.    Blier's gunshot shattered any possibility of a professional career for Bushrod in basketball or any other sport, and thus irretrievably denied him the fulfillment of his lifelong dream to be a professional athlete, a dream that had been within his reach before Blier shot him.

### Allegations as to Officer Blier

43.    On the afternoon of the incident giving rise to this suit, September 10, 2014, Officer Blier recognized Mr. Bushrod from the prior encounters described above, in which Mr. Bushrod had been unarmed, docile, compliant and cooperative.

44.     When Blier saw Bushrod driving on September 10, he saw that Bushrod was not driving dangerously or engaging in any disruptive behavior, but was hardly moving, stuck in rush-hour traffic like hundreds of other motorists in the vicinity.

45.    Blier understood that Bushrod's only wrongdoing was in driving his own car in his own neighborhood while his license was suspended.

46.    The only change from Blier's encounter with Bushrod as a motorist a month earlier was that on this occasion Blier saw Bushrod repeating the same conduct.

47.    On information and belief, Blier experienced the sight of this repetition as a threat to his ego and sense of personal power. This, combined with his short temper, his innate prejudice against African Americans, and his suspicion of Bushrod from the August 7 arrest and the September 4 encounter in the church parking lot, led Blier to an instant impulse to treat Bushrod's behavior as far more dangerous and threatening to public safety than in fact it was.

48.    Because of unrestrained ego, impulsivity, lack of self-control, poor anger management, urge to dominate others, and/or personal bias against African Americans and selectively greater mistrust of them than of other persons, and because of the inadequacy of

police training to help him moderate his impulses as a young policeman, Blier became intent on pursuing, cornering, terrorizing and punishing Bushrod in willful disregard of the simple fact that Bushrod's plodding in slow traffic was not a threat to public safety.

49.   Blier failed to restrain himself from drawing his gun when the circumstances did not warrant even the show of a firearm, much less its use.

50.   Blier failed to restrain himself from shrieking, profanely and repeatedly, in vast disproportion to the circumstances, for Bushrod to "get the f--- out of the car," intimidating and frightening the unarmed man so severely that he could not think rationally.

51.   Blier failed to restrain himself from resorting to violence instead of first giving the terrified, unarmed motorist time to comply with the screamed demand to get out of the motionless car.

52.   Blier failed to restrain himself from violently hurling himself into the Crown Victoria on top of Bushrod, his gun in immediate danger of going off, even though such extreme, violent behavior was unnecessary, unreasonable and unconscionable given the circumstances.

53.   Blier failed to restrain himself from firing his gun at Bushrod's body at close range, and fired deliberately and intentionally.

54.   These acts and omissions violated clearly established rights of Mr. Bushrod of which a reasonable officer should have known, and constituted the use of force sufficiently excessive to overcome both Officer Blier's qualified immunity from Fourth Amendment liability within the meaning of *Graham v. Connor*, 490 U.S. 386, 396 (1989), and Blier's qualified privilege from liability for assault and battery under D.C. common law as set forth in *Kotsch v. Dist. of Columbia,* 924 A.2d 1040, 1050 (D.C. 2007) (applying the qualified immunity standard to a common-law excessive force claim, and relying on *Graham v. Connor*).

55.     These acts and omissions proximately caused Mr. Bushrod substantial and permanent physical damage and other enduring harms to be proven at trial, and entitle him to the substantial compensation prayed for in this Complaint.

56.     Blier later tried to cover for his unlawful shooting of Bushrod by claiming that he fired because Bushrod was about to run him over with the Crown Victoria, or crush him against another car, causing serious or fatal injury. Bushrod intended nothing of the kind, and his actions could not reasonably have been construed to carry such intent or be likely to have such a result. Blier's claim of felonious assault was false; Blier knew it was false when he made it; and he created this supposed excuse for his use of excessive force in order to save himself from the possibility of disciplinary action, however remote such action may have been under the facts alleged below against MPD and its policies.

### Allegations against D.C.

57.     The acts and omissions described below were taken by MPD pursuant to a municipal policy, practice or custom of allowing MPD officers to continue in their jobs, without significant discipline or sanction, or the threat thereof, even if they use excessive force in the field.

58.     The D.C. Metropolitan Police Department ("MPD"), intentionally or negligently or both, failed to train, and had a municipal policy, practice or custom to fail to train, its patrol officers, including Officer Blier and his partner Officer Collins, adequately concerning the circumstances in which the use of deadly force is not justified.

59.     MPD officers, including Officer Blier, were aware of these MPD policies, practices and customs, and this awareness in turn affected their behavior, including the violence of Officer Blier alleged in this Complaint.

60.    The reasonably foreseeable consequences of these municipal policies, practices or customs include the excessive force alleged in this Complaint, and the injuries to Mr. Bushrod that resulted.

61.    Over a period of years or decades, MPD has promulgated, issued or promoted policies on officers' display, brandishment and use of service weapons, and use of deadly force, that were and continue to be so inconsistent with one another as to constitute an intentional or negligent failure to train its officers.

62.    MPD failed, intentionally or negligently or both, to train its patrol officers, including Officers Blier and Collins, to an adequate degree in refraining from, or deterring or dissuading one another from, the use of deadly force where such use is unjustified, and left such matters to the largely or wholly unconstrained discretion of the individual officer(s) in the field.

63.    MPD failed, intentionally or negligently or both, to train or supervise its patrol officers, including Officers Blier and Collins, to an adequate degree in the specifics of controlling their own and one another's anger, ego, or impulses in order to avoid turning less than violent incidents into violent ones by their own actions.

64.    MPD failed, intentionally or negligently or both, to train or supervise its patrol officers sufficiently in the performance of their duties to ensure compliance, and/or to ascertain with reasonable certainty that its officers were complying, with constitutional and common law requirements governing the use of force, in particular deadly force.

65.    MPD failed, intentionally or negligently or both, to train or supervise its patrol officers, including Officers Blier and Collins, to a degree adequate to ensure that they were not making, or would not make, false or misleading reports of incidents to cover for their use of excessive force, or to defeat post-incident investigations or disciplinary action.

66.     MPD was aware at the time of this incident that its internal mechanism for investigating use of force by its officers was so ineffective that it posed, and was generally known by MPD personnel to pose, no serious threat of discipline, demotion or termination of an MPD officer for use of excessive force, in particular deadly force, and that therefore it was failing to operate as a check on officers' behavior in the field.

67.     MPD has known for decades that it has had, and continues to have, a problem with its officers' use of excessive force, but its history shows a systematic failure to address that problem adequately.

68.     A Civilian Complaint Review Board ("CCRB") was established in 1980 to review complaints of excessive force by MPD officers.

69.     MPD was found by a federal district court in *Cox v. District of Columbia*, 821 F. Supp. 1 (D.D.C. 1993), *aff'd*, 40 F.3d 475 (D.C. Cir. 1994), to have a "patently inadequate system of investigation of excessive force complaints," as well as a pattern of showing "deliberate indifference to the rights of persons who come in contact with District police officers."

70.     The district court in *Cox*, affirmed on appeal, held MPD and the District responsible for allowing the CCRB to conduct poor, or no, investigations, and for not disciplining officers regardless of the CCRB's actions.

71.     The CCRB was abolished in 1995, a year after the appeals court decision in *Cox*, in part because of opposition by MPD personnel, and in part because of a huge backlog of excessive force complaints that was insurmountable without a commitment of additional funds that MPD and the District were unwilling to appropriate or expend. With the abolition of the CCRB, the formal external review of excessive-force complaints against MPD officers ceased, and has never resumed.

72.     Some of the CCRB's functions were transferred to MPD's internal affairs division, and at various times were shifted to offices within IAD named "force investigations unit" and "use of force review board." None of these offices, units or entities established a meaningful review process for excessive-force complaints that predictably results in discipline of officers who use excessive force.

73.     Only a system that predictably results in discipline of officers who use excessive force will pose a meaningful deterrent to such use.

74.     MPD knew the essential facts set forth in the preceding paragraphs, and chose to ignore them or give them insufficient weight in formulating its use-of-force policies.

75.     MPD deliberately disbanded its dedicated "force investigations unit" shortly before the September 10, 2014, incident at issue in this case, and merged it into IAD. Specialized training formerly given to MPD excessive-force investigators, whatever the value of such training, ceased at or about this time.

76.     These changes further diminished MPD's ability to investigate and deter use of excessive force, in particular deadly force, by its officers, and confirmed to its officers that the Department did not take use-of-force complaints or investigations seriously.

77.     The adverse impact of this action was compounded by the District's self-serving claim that MPD's use of force investigations unit was no longer needed because the number of reported uses of deadly force by D.C. police had decreased.

78.     Because of the collapse of MPD's force investigations functions into IAD, the investigation and sanction of use of excessive force by MPD officers became even less effective than before this policy change. MPD officers were aware of this fact, and understood it as further confirmation that their misconduct would not be subject to meaningful review.

79.     According to MPD's own figures, calendar year 2014 was one of the three heaviest years since 2001, exceeded only by the slightly higher totals of 2008 and 2011, in number of incidents of the intentional discharge of firearms by MPD personnel.

80.     By understaffing, neglecting and mishandling its use-of-force investigation function over a period of decades, MPD effectively condoned, and continues to condone, the use of excessive force, in particular deadly force, by its officers.

81.     By understaffing, neglecting and mishandling its use-of-force investigation function over a period of decades, MPD effectively adopted as official policy, and continues to foster by official acts and omissions, a climate of impunity surrounding the use of excessive force, regardless of any self-serving statements to the contrary that MPD or District officials have made on the subject.

82.     In January 2016, the D.C. Auditor released a report on the use of force by MPD personnel, prepared by a team led by Michael Bromwich, Esq., former inspector general for the U.S. Justice Department ("Bromwich report"), which noted a serious decline in the quality of use-of-force investigations inside MPD over the period from 2008 to 2015, starting with the end of federal court oversight of MPD under the *Cox* decision in 2008, and including the period of the events that gave rise to this suit.

83.     This report is further evidence of the policy of condonation and the resulting culture of impunity that infects the MPD officer corps with regard to the use of excessive force.

84.     In January 2018, the Office of Police Complaints ("OPC"), an entity that claims to function independently of MPD, issued a report on the use of force by MPD personnel during fiscal year 2017.

85.    That report refers to an MPD general order on the use of force, RAR 901.07

("General Order"), available at https://go.mpdconline.com/GO/GO_901_07.pdf, that claims to

require MPD officers to use the "minimum" force necessary to achieve or restore order.

86.    The 2018 report describes, in theoretical form, five escalating categories of

force, associated with five escalating levels of threat: "compliant," or non-threatening, to

which the response is "cooperative controls," described as "non-physical controls, including

both verbal and non-verbal communication";  "passive resistance," to which the response is

"contract controls," described as "low-level physical force including hand controls and using a

firm grip on the subject to gain compliance";  "active resistance," to which the response is

"compliance techniques," described as "actions that may induce pain or discomfort to an

actively resisting subject[,] includ[ing] control holds, joint locks, OC spray, and solo or team

tactical takedowns";  "assaultive, threat of physical injury," to which the response is "defensive

tactics," described as "actions to forcibly render the subject into submission[,] not likely or

intended to cause death, but meant to insure the safety of officers and others[;] includes ASP

baton strikes and chemical agents";  and "assaultive, threat of serious injury or death," to

which the response is "deadly force," described as "any force likely to cause death or serious

injury to the subject[;] includes strikes to the head with hard objects and the use of a firearm."

87.    This policy, taken at face value, would require officers to graduate the force

used in the field to any given higher level only on failure of all available measures at all lower

levels.

88.    In a letter to OPC in November 2017, referred to in footnote 11 of the report cited

in the preceding paragraph, MPD expressly disclaimed the use of these categories of threat

and response in training, guiding, supervising, evaluating or disciplining its officers. The MPD

November 2017 letter affirmatively stated that MPD does not have a policy forbidding police

officers from drawing, displaying, brandishing or firing their service weapons in any particular circumstances, but rather that the various categories of the use of force in the General Order are "fluid, dynamic, and non-sequential" and can be used at any time, in any order, within the officer's individual discretion during an incident, without apparent restriction, prospect of internal MPD discipline, or other sanction.

89.    This statement, and the ample other evidence of condonation of excessive force alleged in this Complaint and to be proven at trial, strip to incoherence—and effectively negate—the General Order's supposed policy to require MPD officers to use "minimum" necessary force in the field, or escalate to each higher level of force only on failure of measures at lower levels.

90.    At the time of the police abuse alleged in this suit, MPD did not have a policy explicitly forbidding the use of deadly force in any particular circumstances, and instead left largely or wholly unconstrained the discretion of the individual officer in the field to use deadly force against a member of the public.

91.    At the time of filing of this Complaint, MPD still does not have a policy explicitly forbidding the use of deadly force in any particular circumstances, and leaves largely or wholly unconstrained the discretion of the individual officer in the field to use deadly force against a member of the public.

92.    At the time of this incident, MPD did not have a policy explicitly forbidding the drawing of service weapons in any particular circumstances, and instead left largely or wholly unconstrained the discretion of the individual officer in the field to draw his or her service weapon against a member of the public.

93.    At the time of filing of this Complaint, MPD still does not have a policy explicitly forbidding the drawing of service weapons in any particular circumstances, and

instead leaves largely or wholly unconstrained the discretion of the individual officer in the field to draw his or her service weapon against a member of the public.

94.     In expressly declining to promulgate or enforce policies limiting or forbidding the discharge of firearms in particular circumstances, MPD has effectively adopted a policy, practice or custom of condoning the use of excessive force, in particular deadly force, by MPD officers, and has created, and continues to foster, a climate of impunity surrounding such use, regardless of any statements to the contrary that MPD or District officials have made on the subject.

95.     The use of excessive force alleged in this Complaint was a reasonably foreseeable consequence of MPD's and the District's acts and omissions alleged in the preceding paragraphs.

96.     The acts and omissions alleged in the preceding paragraphs, and the culture of condonation and impunity with regard to excessive force that continues to exist at MPD and among its officers as a result of these acts and omissions, constituted and continue to constitute a "custom, policy or usage" under color of D.C. law as required to establish municipal liability under *Monell v. New York City Department of Social Services*, 436 U.S. 658 (1978), and its progeny.

97.     These acts and omissions by the District and MPD, and other acts and omissions by the District and MPD to be proven at trial, constitute intentional or negligent failure, or both, to conform MPD's policies, training, and supervision of police officers to the requirements of federal and D.C. law, including but not limited to the Fourth Amendment, and constitute a "custom, policy or usage" of such failure under color of D.C. law as required to establish municipal liability under *Monell v. New York City Department of Social Services*, 436 U.S. 658 (1978), and its progeny.

*Notice of claim filed*

98.    A notice of claim under D.C. Code § 12-309 was timely filed, within six months of the incident from which this suit arises, with all appropriate deliveries timely made.

### Count I:
### Section 1983 claim against Blier

99.    The acts and omissions of Officer Blier alleged in this Complaint, namely Blier's use of excessive force against Bushrod, violated Bushrod's right under the Fourth Amendment to the United States Constitution to be free from unreasonable searches and seizures.

100.    The acts and omissions of Blier alleged herein caused severe and lasting harm to Bushrod and entitle him to redress against Blier pursuant to 42 U.S.C. § 1983.

### Count II:
### Section 1983 claim against D.C. and Newsham

101.    The acts and omissions of defendants Newsham and the District of Columbia alleged in this Complaint, namely MPD policies condoning excessive force and firearm use by police as alleged above, and defendant Newsham's authorization and supervision of those policies, constituted a municipal policy, practice or custom that violated Bushrod's right under the Fourth Amendment to the United States Constitution to be free from unreasonable searches and seizures.

102.    Defendants Newsham and the District of Columbia are liable to Bushrod under 42 U.S.C. § 1983 for this violation of his federal constitutional rights, because the violation was caused by a policy, practice, or custom of the District of Columbia.

103.    Defendants Blier, Newsham and the District of Columbia are jointly and severally liable to Bushrod pursuant to 42 U.S.C. § 1983 for this violation of his federal constitutional rights.

## Count III:
## Assault and battery against all defendants under D.C. common law

104.   Defendant Blier, by using a degree of force against Bushrod that was not reasonably necessary under the circumstances, namely by shooting and injuring him as alleged in this Complaint, committed against him the tort of assault and battery under D.C. common law.

105.   Defendants Newsham and the District of Columbia, as Blier's employers, are liable to Bushrod, under the doctrine of *respondeat superior* applicable to common law torts in this jurisdiction, for the assault and battery, and the harms to Bushrod flowing therefrom, that Blier inflicted while acting within the scope of his MPD employment and on behalf of and in the interest of his employer.

## Count IV:
## Intentional infliction of emotional distress under D.C. common law

106.   Defendant Blier's acts and omissions as alleged in this Complaint, namely shooting and injuring Bushrod in the unconscionable way he did, constituted extreme and outrageous conduct that intentionally or recklessly caused Bushrod severe emotional distress.

107.   Defendant Blier is therefore liable to Bushrod for the tort of intentional infliction of emotional distress under D.C. common law.

108.   Defendants Newsham and the District of Columbia, as Blier's employers, are liable to Bushrod, under the doctrine of *respondeat superior* applicable to common law torts in this jurisdiction, for Blier's intentional infliction of emotional distress while acting within the scope of his MPD employment and on behalf of and in the interest of his employer.

**Count V:**
**Negligence against all defendants under D.C. common law**

109.   Defendant Blier, by failing to take due care not to use an unreasonable degree of force against Bushrod under the circumstances, namely by shooting him and causing him severe and lasting harms as alleged in this Complaint, committed against him the tort of negligence under D.C. common law.

110.   Defendant Blier, by failing to take due care to restrain himself, his ego, his urge to dominate, his prejudice against African Americans, and any other impulses that will be proven at trial, committed against Bushrod the tort of negligence under D.C. common law.

111.   Defendants Newsham and the District of Columbia, as Blier's employers, are liable to Bushrod, under the doctrine of *respondeat superior* applicable to common law torts in this jurisdiction, for the negligence that Blier inflicted while acting within the scope of his employment as an MPD officer and on behalf of and in the interest of his employer.

**Prayer for relief**

112.   WHEREFORE, plaintiff Kevin Bushrod, Jr., respectfully requests as follows:

(a)   That this Court rule that the acts and omissions of the defendants, and each of them, as alleged in this Complaint, violated Bushrod's rights under the Fourth Amendment to the federal Constitution, and under D.C. common law;

(b)   That this Court enter judgment awarding Bushrod compensatory damages against the defendants, and each of them, in an amount appropriate to the evidence adduced at trial;

(c)     That this Court enter judgment awarding Bushrod punitive damages

against the defendants, and each of them, in an amount appropriate to

the evidence adduced at trial;

(d)     That this Court enter judgment awarding Bushrod his costs and

reasonable attorneys' fees in this action as provided by 42 U.S.C.

§ 1988(b);  and

(e)     That this Court grant Bushrod such further declaratory, injunctive

and/or monetary relief as this Court may deem just and proper.

### Jury demand

113.   Plaintiff requests a trial by jury.


Respectfully submitted,

_____
Stephen B. Pershing
D.C. Bar No. 482580
Pershing Law PLLC
1416 E Street, N.E.
Washington, D.C. 20002
(202) 642-1431 (o/m)
steve@pershinglaw.us

*Counsel for plaintiff Kevin Bushrod, Jr.*

Dated: February 20, 2018

^   ^   ^   ^

## CERTIFICATE OF SERVICE

I certify that on this 20th day of February, 2018, I caused the foregoing to be filed through the Court's CaseFileXpress system and additionally served by electronic mail on counsel for the defense, as follows:

    Benjamin E. Bryant, Esq.
    Office of the District of Columbia Attorney General
    Civil Litigation Division, Section IV
    441 4th Street, N.W., Suite 630 South
    Washington, D.C. 20001
    benjamin.bryant@dc.gov

                         _____
                         Stephen B. Pershing