UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

**KEVIN BUSHROD**,

Plaintiff,

v.

**DISTRICT OF COLUMBIA,**

**ZACHARY BLIER,**

Defendants.

Case No. 1:18-cv-02462 (TNM)

<u>**MEMORANDUM OPINION**</u>

This action arises from a police shooting in Washington, D.C.  Plaintiff Kevin Bushrod sues Officer Zachary Blier and the District of Columbia alleging that Blier used excessive force, committed assault, and intentionally inflicted emotional distress when he shot and injured Bushrod following Bushrod's flight from a traffic stop.  Defendants move for summary judgment, contending that Bushrod cannot prevail given the undisputed facts and the protections granted by the doctrines of qualified immunity and qualified privilege.  Having scrutinized the parties' briefs, the entire record, and the applicable law, the Court will grant Defendants' motions.

## I.  BACKGROUND

Many facts here are in dispute and—critically—what *can* be disputed is a matter of dispute.  Let us begin with what is undisputed.

In the early evening on September 10, 2014, Officer Blier of the Metropolitan Police Department ("MPD") was driving his cruiser while on patrol in Northeast D.C.  *See* Def. Zachary Blier's Statement of Undisputed Material Facts in Support of Mot. for Summ. J.

("SUMF") at 2, ECF No. 28-1; Second Am. Compl. ("Compl.") at 5; ECF No. 8.[1]  Officer Gregory Collins rode shotgun.  *Id.*  The officers spotted Bushrod driving down South Dakota Avenue in a Ford Crown Victoria.  *Id.*  Both recognized him as someone they had arrested several weeks earlier for driving a car without a valid license and with expired registration.  SUMF at 2–3; Pl.'s Statement of Disputed Facts in Opp'n to Summary Judgment ("Pl.'s Facts") at 5–6 , ECF No. 35-1.  Bushrod was out on bail but had been ordered not to drive in the city without a valid permit.  *Id.*

Seeing Bushrod driving the Crown Victoria, Collins checked the car's registration, confirming that it remained expired.  SUMF at 3; Pl.'s Facts at 6–7.  The officers then followed Bushrod's car to pull him over.  *Id.*  The parties dispute what happened next.

According to Bushrod, he did not realize that the officers were following him or trying to pull him over.  Pl.'s Facts at 7–8.  He drove safely down a quiet residential street in "tame circumstances" before turning back onto South Dakota Avenue, which was clogged with slow-moving rush hour traffic.  Compl. at 5.  While Bushrod's car was in an intersection waiting for traffic to move, Blier pulled up directly behind him.  *Id.* at 6.  Both officers leapt from the cruiser with their guns drawn.  *Id.*  Blier yelled expletives and demanded that Bushrod exit his car.  *Id.*  Before Bushrod could react, Blier opened the driver's side door, thrust himself across Bushrod's body, and reached for the keys in the ignition.  *Id.* at 6–7.  Bushrod tried to put the car back into gear to drive away but, before the car moved, Blier jumped backward out of the car and shot him once without warning.  *Id.*  The bullet traveled about three feet through the open car door and struck Bushrod in the left shoulder.[2]  *Id.*  The wound required emergency surgery and left

---

[1]  All citations are to the page numbers generated by this Court's CM/ECF system.

[2]  Bushrod's complaint contains no facts about the day of the incident beyond the moment of the shot.  *See* Compl. at 7–8.

Bushrod with permanent physical and psychological damage.  *Id.* at 7–8.  He suffers from chronic pain and limited use of his arm and torso.  *Id.*

Unsurprisingly, Defendants offer a different story.  After confirming that the registration on Bushrod's car remained expired, the officers activated the cruiser's lights and siren.  SUMF at 4.  Bushrod then pulled to the right lane and slowed down, but as the officers exited the cruiser and approached the car, Bushrod sped off.  *Id.*  The officers jumped in their cruiser and chased Bushrod down several streets.  *Id.*  He eventually drove back toward South Dakota Avenue, which was blocked by traffic.  *Id.* at 5.  Bushrod maneuvered into the busy intersection anyways, stopping only after sideswiping the front of an occupied Honda CR-V and rolling over the curb of the median that divided the inbound and outbound lanes.  *Id.*  At this point the rear of the Crown Victoria was partially in front of the Honda CR-V's left bumper.  *Id.* at 6.

After seeing that Bushrod's car had stopped, both officers exited their cruiser.  *Id.*  Blier walked around the back of the Honda CR-V and approached the driver's side of Bushrod's car. *Id.*  With his gun drawn but pointed toward the ground, he opened the driver's door of the Crown Victoria with his left hand.  *Id.* at 7.  He grabbed Bushrod's arm and tried to pull him out of the car while directing him to comply.  *Id.*  Bushrod instead shifted the car into reverse and pressed the accelerator.  *Id.* at 7–8.  As the car reversed, the open front door struck Officer Blier in the leg and pushed him backward toward the Honda CR-V.  *Id.* at 8.  Officer Blier hopped onto the front hood of the CR-V, with his legs dangling off the front.  *Id.* at 8–9.  Officer Blier "feared for his life and that he was in risk of severe bodily harm" so he "discharged his firearm once to stop [Bushrod] from continuing to drag or crush him with Crown Victoria" that was still reversing. *Id.* at 9.

3

Right after the shot, Bushrod shifted the car into drive and drove off.  *Id.* at 10.  He hit a Ford Escape and a Mercedes Benz as he drove between them, before finally colliding with a Honda Accord down the street.  *Id.*  Bushrod abandoned the Crown Victoria and ran away but was apprehended and taken to a hospital.  *Id.*

The parties largely agree on the later legal proceedings.[3]  The U.S. Attorney's Office charged Bushrod with 15 offenses and the case proceeded to a jury trial in the Superior Court for the District of Columbia.[4]  Defense counsel conceded that Bushrod drove without a license, eluded the police, and struck Officer Blier with his car, but he contested that Bushrod had committed felony-level assault of a police officer.  *See* Pl.'s Facts at 24–25.  Counsel stated during closing arguments:  "[Bushrod] resisted.  He tried to get away and he shouldn't have. Absolutely.  The question is was he armed with a dangerous weapon.  And did he put Officer Blier at grave risk of serious bodily injury.  The answer is, to both of those questions, [] no." Trial Tr. at 97, ECF No. 45-1.  As to the car hitting Blier, counsel explained that he "was hit in the lower, left shin by the lower part of the door . . .  He was bumped."  *Id.* at 96.  He also

---

[3]  The parties dispute the conclusions and significance of an MPD investigation into the shooting. But the results are immaterial to the Court's analysis and thus do not require explanation.  *See City & Cty. of San Francisco, Calif. v. Sheehan*, 575 U.S. 600 (2012) ("Even if an officer acts contrary to her training . . . that does not itself negate qualified immunity where it would otherwise be warranted.").

[4]  The charges were:  (1) operating a vehicle after suspension of a permit, in violation of D.C. Code § 50-1403.01 (Count 1); (2) contempt based on violating a condition of release (Count 2), (3) felony flight from law enforcement officers, in violation of D.C. Code § 2201.05b (Count 3); (4) misdemeanor destruction of property (the Honda CRV) causing damage of $1,000 or less, in violation of D.C. Code § 22-303 (Count 4); (5) leaving the scene after causing property damage (to the Honda CRV), in violation of D.C. Code § 50-2201.05c (Count 5); (6) assault on a police officer, in violation of D.C. Code § 22-405 (Count 6); (7) assault with a dangerous weapon, in violation of D.C. Code § 22-402 (Count 7); (8) malicious destruction of property worth less than $1,000 (Count 8); (9) three counts of malicious destruction of property causing damage of $1,000 or more (Counts 10, 12, 14); and (10) four more counts of leaving the scene after causing property damage (Counts 9, 11, 13, 15).  *See* SUMF at 12–13; Pl.'s Facts at 22.

asserted: "[Bushrod] didn't even know Officer Blier was there for all he knew.  He backed it up and Officer Blier was in the way.  He got bumped."  *Id.* at 99.

A D.C. jury convicted Bushrod of most of the charges.[5]  Relevant here, the jury found him guilty of fleeing from law enforcement officers while on release for a crime (Count 3); destruction of property for damaging the Honda CR-V (Count 4); and leaving the scene after damaging the Honda CR-V (Count 5).  *See* Trial Tr. at 15–16, ECF No. 45-2.  The jury also acquitted him of felony assault on a police officer but convicted him of the lesser included offense of misdemeanor assault on a police officer (Count 6).  *Id.* at 16.  Bushrod did not appeal his convictions.  *See* SUMF at 15; Pl.'s Facts at 25–26.

Several years later, Bushrod sued the District of Columbia ("the District") and Blier in Superior Court.[6]  Defendants removed the case here.  *See* ECF No. 5.  Bushrod alleges that Blier violated the Fourth Amendment under 42 U.S.C. § 1983 by using excessive force against him (Count I), assaulted and battered him under D.C. common law (Count II), and intentionally inflicted emotional distress (Count III).  Compl. at 11–12.  Bushrod also seeks to hold the District vicariously liable for Counts II and III.  *Id.*  The parties concluded discovery, and motions for summary judgment by Blier and the District are now ripe.[7]

---

[5]  The Government withdrew counts 12, 13, and 14, which concerned damage to cars other than the Honda CR-V.  *See* Trial Tr. at 41, 75, ECF No. 45-1.

[6]  Bushrod also sued MPD's then-Chief, Peter Newsham, but did not renew the claims against him in his latest complaint.

[7]  This Court has jurisdiction over Count I under the federal question statute, 28 U.S.C. § 1331.  It has supplemental jurisdiction over Counts II and III because they formed "part of the same case or controversy" as the federal claim over which the Court has original jurisdiction.  28 U.S.C. § 1367(a).  Because the Court will grant summary judgment on the only federal claim, it may decline to exercise supplemental jurisdiction over the remaining common law claims.  *See* 28 U.S.C. § 1367(c)(3) ("A district court may decline to exercise supplemental jurisdiction over [claims outside of its original jurisdiction] if . . . the district court has dismissed all claims over

## II.  STANDARD OF REVIEW

Summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A fact is material if it "might affect the outcome of the suit under the governing law" and a dispute is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  If evidence conflicts, courts "view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in its favor" when determining whether summary judgment is appropriate.  *Mastro v. Potomac Elec. Power Co.*, 447 F.3d 843, 850 (D.C. Cir. 2006).

The moving party has the initial burden of identifying those portions of the record that show the lack of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).  Once the moving party has met that burden, the nonmoving party must "designate specific facts showing that there is a genuine issue for trial."  *Id.* at 324 (cleaned up).  It is not enough to advance unsupported allegations or denials in the pleadings.  *See* Fed. R. Civ. P. 56(c).

---

which it has original jurisdiction.").  When all federal-law claims have "left the building" before trial, the Court will decline to exercise jurisdiction over the remaining state-law claims in the "usual case."  *Araya v. JPMorgan Chase Bank, N.A.*, 775 F.3d 409, 417–19 (D.C. Cir. 2014).  But the decision is a discretionary one.  *See Osborn v. Haley*, 549 U.S. 225, 245 (2007).  In deciding, the Court must consider equitable factors including "judicial economy, convenience, fairness, and comity."  *Hargraves v. District of Columbia*, 134 F. Supp. 3d 68, 89–90 (D.D.C. 2015) (cleaned up) (retaining jurisdiction over D.C. law claims after determining that qualified immunity applied to police officers' use of force during arrest).  Here, the parties completed comprehensive discovery before this Court, where they have litigated for over two years.  *See id.* at 90 (relying on "extensive and already completed" discovery).  This discovery included supplemental record material ordered by the Court.  *See* Order, ECF No. 44; Response to Order of the Court, ECF No. 45.  More, the remaining claims do not raise any novel issues of D.C. law.  *Cf. Araya*, 775 F.3d at 419 (explaining remand appropriate where "the local claims involve novel and complex issues").  In fact, the analysis in all three claims substantially overlaps.  Judicial economy and convenience weigh against having the parties relitigate the issues elsewhere.  The Court finds that the factors overall warrant retaining jurisdiction over the two common law claims.

Because the non-moving party must provide evidence that, if true, would permit a reasonable jury to find in his favor, the non-moving party "must have more than a scintilla of evidence to support his claims." *Freedman v. MCI Telecommunications Corp.*, 255 F.3d 840, 845 (D.C. Cir. 2001). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249–50 (cleaned up).

In cases involving allegations that a police officer used excessive force, "'a defendant's motion for summary judgment is to be denied only when, viewing the facts in the record and all reasonable inferences derived therefrom in the light most favorable to the plaintiff, a reasonable jury could conclude that the excessiveness of the force is so apparent that no reasonable officer could have believed in the lawfulness of his actions.'" *Elshazli v. District of Columbia*, 415 F. Supp. 3d 20, 23–24 (D.D.C. 2019) (quoting *Wardlaw v. Pickett*, 1 F.3d 1297, 1303 (D.C. Cir. 1993)).

## III.  ANALYSIS

### A.  Collateral Estoppel Precludes Bushrod from Disputing Certain Facts

Defendants maintain that Bushrod's Superior Court convictions preclude him from advancing certain arguments here.[8]  They first point to issue preclusion, also known as "collateral estoppel."

---

[8]  The District alone raises two other doctrines, neither of which applies.  *First*, the District states in passing that Bushrod's "criminal conviction for assaulting a police officer is *res judicata* for the purpose of this civil lawsuit," and then cites a case applying the doctrine of res judicata. Dist. of Columbia's Mem. of P. & A. in Support of Mot. for Summ. J. ("D.C. Mem.") at 9, ECF No. 29-1.  Also known as "claim preclusion," res judicata bars lawsuits addressing "the same claims or cause of action" as an earlier case "between the same parties or their privities." *Porter v. Shah*, 606 F.3d 809, 813 (D.C. Cir. 2010).  But Defendants were not parties in Bushrod's criminal prosecution.  And that case did not adjudicate Officer Blier's use of force—nor could it have.  *Second*, the District contends that the *Rooker-Feldman* doctrine bars Bushrod's claim. D.C. Mem. at 8–9.  This exceedingly narrow doctrine applies only to foreclose improper appeals—that is, federal-court actions that erroneously seek to "reverse, reject, overturn or undo

"Under collateral estoppel, once a court has decided an issue of fact or law necessary to its judgment, that decision may preclude relitigation of the issue in a suit on a different cause of action involving a party to the first case." *U.S. Postal Serv. v. Am. Postal Workers Union*, 553 F.3d 686, 696 (D.C. Cir. 2009) (cleaned up).  The doctrine applies with equal force when the prior case was a criminal prosecution and the latter case raises a federal claim under 42 U.S.C. § 1983.  *See Migra v. Warren City Sch. Dist. Bd. of Educ.*, 465 U.S. 75, 82–83 (1984).  A party cannot rely on collateral estoppel when the opposing party did not have a "full and fair opportunity" to litigate the issue in the earlier case.  *Allen v. McCurry*, 449 U.S. 90, 95 (1980).  But otherwise, federal courts must "give preclusive effect to state-court judgments whenever the courts of the State from which the judgments emerged would do so." *Id.* at 96 (interpreting 28 U.S.C. § 1738).

The prior case here is Bushrod's criminal prosecution in Superior Court, so D.C.'s preclusion law applies.  *See Migra*, 465 U.S. at 87.  In the District of Columbia, collateral estoppel renders an "an issue of fact or law" conclusive in a subsequent case when "(1) the issue is actually litigated and (2) determined by a valid, final judgment on the merits; (3) after a full and fair opportunity for litigation by the parties or their privies; (4) under circumstances where the determination was essential to the judgment, and not merely dictum." *Modiri v. 1342 Rest. Group, Inc.*, 904 A.2d 391, 394 (D.C. 2006) (cleaned up).  In other words, collateral estoppel "precludes the relitigation of issues actually litigated and necessary to the outcome of a prior case involving the party against whom estoppel is asserted." *Carr v. Rose*, 701 A.2d 1065, 1076

---

state-court judgments." *Target Media Partners v. Specialty Mktg. Corp.*, 881 F.3d 1279, 1290 (11th Cir. 2018) (Newsom, J. concurring) (cleaned up); *see also Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 291–94 & n.8 (2005) (explaining relationship between *Rooker-Feldman* doctrine and preclusion).  Bushrod does not seek to overturn or appeal his criminal convictions through this civil suit.

(D.C. 1997).  The party asserting collateral estoppel bears the burden of showing that an issue in question is identical to what was determined in the prior proceeding.  *Merle v. United States*, 683 A.2d 755, 762 (D.C. 1996).

"[D]istrict courts in this Circuit have routinely treated criminal convictions . . . as conclusive proof of the facts supporting the conviction, and have thus given them preclusive effect in subsequent civil actions."  *Hume v. Watson*, 680 F. Supp. 2d 48, 50 (D.D.C. 2010) (cleaned up).  To determine what issues were "necessary" to a prior conviction, "the Court must examine the record, including the pleadings, the evidence submitted, the jury instructions, and any opinions of the courts, to discern which matters were directly put in issue and actually decided in the antecedent proceeding."  *Cumis Ins. Soc'y, Inc. v. Clark*, 318 F. Supp. 3d 199, 216 (D.D.C. 2018) (cleaned up).  But courts "must take a practical view of all the circumstances in deciding whether collateral estoppel applies."  *United States v. Bowman*, 609 F.2d 12, 17 (D.C. Cir. 1979).  "The rule of collateral estoppel in criminal cases is not to be applied with the hypertechnical and archaic approach of a 19th century pleading book, but with realism and rationality."  *Ashe v. Swenson*, 397 U.S. 436, 444 (1970).

Defendants assert that several issues raised or facts contested by Bushrod were adjudicated in his criminal proceedings, rendering them indisputable.  *See* Def. Zachary Blier's Mot. for Summ. J. ("Blier Mot.") at 10–14, ECF No. 28; D.C. Mem. at 10–11, 14.  The Court recognizes that the prior convictions have some preclusive effect but does not agree entirely with Defendants as to their import.  The Court will address the convictions in turn.

### 1.  Bushrod's Convictions for Striking the Honda CR-V have Preclusive Effect

The Court first addresses the preclusive effect of Bushrod's convictions related to hitting the Honda CR-V before the shooting.  Two offenses are at issue:  malicious destruction of

property worth less than $1,000 (Count 4) and leaving the scene after a car collision (Count 5). *See* Blier Mot. Ex. 10 ("Superior Court Docket") at 12, ECF No. 28-10; Trial Tr. 15–16, ECF No. 45-2. Bushrod's complaint fails to mention colliding with the Honda CR-V, and his brief opposing summary judgment states that it is "[d]isputed that Bushrod sideswiped the CR-V." Pl.'s Facts at 9. But Bushrod did *not* dispute that Counts 4 and 5 pertained to damage from striking the Honda CR-V. *See* Pl.'s Facts at 22 (stating "Undisputed" as to the fact that the charges included "misdemeanor destruction of property (the Honda CRV) causing damage of $1,000 or less, D.C. Code § 22-303 (Count 4)" and "leaving after causing property damage to the Honda CRV, D.C. Code § 50-2201.05c (Count 5)"). More, the jury instructions on Count 4 confirm that it pertained to damaging the Honda CR-V. *See* Trial Tr. at 123–24, ECF No. 45-1.[9]

Defendants have met their burden to show that collateral estoppel applies. "A criminal conviction is conclusive proof and operates as an estoppel on [a] defendant[] as to the facts supporting the conviction in a subsequent civil action." *Hinton v. Shaw Pittman Potts & Trowbridge*, 257 F. Supp. 2d 96, 100 (D.D.C. 2003) (cleaned up). It hardly requires stating that Bushrod ramming the Honda CR-V was "necessary to the outcome of" his convictions for maliciously damaging the CR-V and for fleeing after the collision. *Carr*, 701 A.2d at 1076. "Realism and rationality" demand that conclusion. *Ashe*, 397 U.S. at 444. Nor is there any doubt that a conviction in Superior Court is a "valid, final judgment on the merits," *Modiri*, 904

---

[9] The instructions included that advisement that, among other elements, the jury must find beyond a reasonable doubt that: "Kevin Bushrod damaged or destroyed property, that is, a Honda CRV; the property was not his property; he acted voluntarily and on purpose, and not by mistake or accident; Kevin Bushrod intended to damage or destroy the property or was aware that his conduct created a substantial risk of harm to that property but engaged in that conduct nonetheless." Trial Tr. at 123–24, ECF No. 45-1.

A.2d at 394, or that Bushrod received a "full and fair opportunity" to litigate the issue in that setting, *Allen*, 449 U.S. at 95.

Bushrod's briefing offers no rebuttal on this point. *See* Pl.'s Mem. in Opp'n to Summary Judgment ("Pl.'s Opp'n") at 2–6, ECF No. 35. Bushrod contends that the jury in his criminal case did not decide whether Blier used excessive force because that issue was not before them. Pl.'s Opp'n at 2–3, 5. True enough. But that does not mean that Bushrod's criminal case lacks preclusive effects. The very cases that Bushrod cites explain as much, rejecting arguments that a prior conviction for assault precluded a § 1983 *claim* but then determining that certain *facts* were established in the prior adjudications. *See Fenwick v. United States*, 926 F. Supp. 2d 201, 217–19 (D.D.C. 2013) (precluding plaintiff in § 1983 suit from advancing certain factual assertions based on determinations in prior case), *rev'd on other grounds sub nom. Fenwick v. Pudimott*, 778 F.3d 133 (D.C. Cir. 2015); *Lassiter v. District of Columbia*, 447 A.2d 456, 460 (D.C. 1982) (determining that certain facts in § 1983 suit were established in prior juvenile adjudication).

So too here. A jury convicted Bushrod of criminally damaging the Honda CR-V and then driving away. Trial Tr. at 15–16, ECF No. 45-1. Bushrod cannot now challenge the facts that the jury necessarily found to convict him beyond a reasonable doubt. So Bushrod's convictions on Counts 4 and 5 preclude him from contesting that, before the shooting, he struck the Honda CR-V with his car and then drove away, as Defendants allege.

### 2. Bushrod's Conviction for Fleeing from Police has Preclusive Effect

Defendants next contend that Bushrod's conviction for fleeing from police precludes him from arguing that he never engaged in any dangerous or noncompliant behavior before the shooting. *See* Blier Mot. at 18–21. A jury convicted Bushrod for fleeing from law enforcement officers in a motor vehicle (Count 3). Defendants argue that the jury necessarily accepted the

prosecution's arguments that Bushrod fled from the officers before the shooting, specifically by speeding away "reckless[ly]" when they tried to pull him over on a side street.  Blier Mot. at 12; *see also* SUMF at 7 ("[A]s the officers proceeded to exit the cruiser the plaintiff drove away recklessly at a speed above the posted speed limit.").  If Defendants are right, Bushrod cannot now assert that he drove safely down a quiet residential street under "tame circumstances," Compl. at 5, and "did not believe he was being pulled over or drive away recklessly," Pl.'s Facts at 7 (cleaned up).

Defendants are mostly correct.  The trial court advised that to convict Bushrod on Count 3, the jury must find beyond a reasonable doubt that:

> Kevin Bushrod was operating a motor vehicle; a law enforcement officer signaled him to bring the motor vehicle to a stop; after the signal from a law enforcement officer, Kevin Bushrod failed or refused to bring the motor vehicle to an immediate stop, or attempted to elude the law enforcement officer; and he did so voluntarily, on purpose, and not by mistake or accident; and while failing or refusing to bring the motor vehicle to an immediate stop, the defendant damaged property and drove recklessly.

Trial Tr. at 122–23, ECF No. 45-1.  The court also instructed the jury on the definition of "signaled" and the elements of reckless driving.[10]  The closing arguments to the jury confirm that the prosecution's evidence on Count 3 related to Bushrod's flight from the officers after the initial attempt to pull him over but before the shooting.  *Id.* at 78–80.  Defense counsel contested the degree to which Bushrod drove erratically, suggesting that he "wasn't even going very fast." *Id.* at 88.  But in convicting on Count 3, the jury necessarily accepted the prosecution's version of events that Bushrod at least fled from the officers "on purpose" and drove "recklessly."  *Id.* at 122–23.  The jury could not have convicted Bushrod otherwise under the judge's instructions.

---

[10]  Those latter elements were:  "That Kevin Bushrod drove a motor vehicle on a public road; he did so carelessly; and he knew or should have known that his acts created an unreasonable risk of injury to persons or damage to property."  Trial Tr. at 123, ECF No. 45-1.

More, a finding of "reckless" driving required determining that Bushrod's "acts created an unreasonable risk of injury to persons or damage to property." *Id.* at 123.

Collateral estoppel applies here as well. *See Hinton*, 257 F. Supp. at 100 ("A criminal conviction is conclusive proof . . . as to the facts supporting the conviction."). As with his convictions on Counts 4 and 5, Bushrod had a "full and fair opportunity" to contest the facts that were necessary to his conviction. *Allen*, 449 U.S. at 95. Defense counsel's attempt at mitigation during closing argument shows this to be true. And the jury instructions make clear which facts were "necessary." *Carr*, 701 A.2d at 1076. So Bushrod cannot now dispute what the jury as factfinder determined. He may not contest that he "understood a traffic stop was being attempted or initiated against him" before he was shot, that he "fled from the officers," that he was ever in "flight from the officers," and that he drove away from them "recklessly." Pl.'s Facts at 7, 9.

But Bushrod may still contest that he drove away "at a speed above the posted speed limit." Pl.'s Facts at 7; SUMF at 4. That fact was disputed at the criminal trial and unnecessary to the jury's findings that Bushrod drove recklessly and fled from the officers. The streets were congested with rush-hour traffic, *see* Pl.'s Facts at 8–9, presenting opportunities to unreasonably risk harm without achieving a high rate of speed. After all, speeding can be reckless, but reckless driving does not require exceeding the speed limit. Rather, it requires driving that creates an "unreasonable risk of injury to persons or damage to property." Trial Tr. at 123, ECF No. 45-1. So one could, for example, recklessly run through stoplights, weave around cars, drive on the shoulder, or endanger pedestrians all without exceeding a posted speed limit. Indeed, the driver of the Honda CR-V testified that Bushrod drove only "as fast as you were able to go weaving in and out of traffic . . . about 25 or 30 miles an hour," summing it up as "aggressive driving." Trial Tr. at 39, ECF No. 28-3. The jury need not have—and apparently did not—

13

determine the precise nature of Bushrod's dangerous driving, other than to conclude that it rose

to the level of recklessness.  So while he must accept that he drove "recklessly," Bushrod may

contest that he was speeding.

### 3.  Bushrod's Conviction for Assault on a Police Officer has Preclusive Effect

Defendants contend that Bushrod's conviction on Count 6 for misdemeanor assault on a

police officer, in violation of D.C. Code § 22-405,[11] settles several more factual disputes.  *See*

Blier Mot. at 19–21.  The Court agrees.

The parties spend much of their briefing arguing over the scope of the statute.[12]  But for

collateral estoppel purposes, what matters is what the jury determined in Bushrod's criminal

---

[11]  Bushrod contends that he was in fact convicted of D.C. Code § 22-505, but this statute was superseded in 2001 by § 22-405, which contains nearly identical language.  *See Dickens v. United States*, 19 A.3d 321, 323 n.3 (D.C. 2011); *Wasserman v. Rodacker*, No. CIV.A.06 1005 RWR, 2007 WL 2071649, at *4 n.6 (D.D.C. July 18, 2007).

[12] As the parties note, the statute's language swept broadly.  At the time of Bushrod's arrest in 2015, the statute covered whoever "without justifiable and excusable cause, assaults, resists, opposes, impedes, intimidates, or interferes with a law enforcement officer on account of, or while that law enforcement officer is engaged in the performance of his or her official duties." D.C. Code § 22-405(b) (2013); *Foster v. United States*, 136 A.3d 330, 332 (D.C. 2016).  Despite this capacious language, case law pre-dating Bushrod's conviction narrowed the conduct that could support a conviction.  An individual could not be found guilty for "mere passive resistance or avoidance" or for merely fleeing from officers.  *Coghill v. United States*, 982 A.2d 802, 806 (D.C. 2009) (upholding conviction for defendant who forcibly resisted officers as they handcuffed him but reversing conviction for defendant who fled from officers).  Rather, the "conduct must cross the line into active confrontation, obstruction or other action directed against an officer's performance in the line of duty by actively interposing some obstacle that precluded the officer from" completing the arrest.  *Id.* (cleaned up); *see also In re C.L.D.*, 739 A.2d 353, 357 (D.C. 1999) (interpreting D.C. Code § 22-505, an older statute criminalizing the same conduct).  The jury instructions in Bushrod's criminal case incorporate these limitations by restricting the offending conduct, asking whether Bushrod "assaulted, resisted, intimidated, or interfered with" Officer Blier.  *See* Trial Tr. at 131–32, ECF No. 45-1.  Well after the events here, the D.C. Council amended § 22-405 out of "concern that the statute was over inclusive." *Coleman v. United States*, 194 A.3d 915, 917 (D.C. 2018).  So the current statute criminalizes only "assault[ing] a law enforcement officer," D.C. Code § 22-405 (2016), while a separate provision addresses resisting arrest, *see* D.C. Code § 22-405.01.

case, not what was theoretically possible.  *See Carr*, 701 A.2d at 1076; *Ashe*, 397 U.S. at 444.

Bushrod faced three charges on Count 6: (1) Assault on a Police Officer while Armed, (2)

Assault on a Police Officer while Unarmed, and (3) Misdemeanor Assault on a Police Officer.

Trial Tr. at 132, ECF No. 45-1.  The latter two are lesser included versions of the first charge.

The court instructed the jury that to convict Bushrod of the lowest charge—misdemeanor assault

on a police officer—it must find beyond a reasonable doubt that:

> Zachary Blier was a police officer operating and authorized to act in the District of
> Columbia[;] Kevin Bushrod assaulted, resisted, intimidated, or interfered with
> Zachary Blier[;] Kevin Bushrod did so voluntarily, on purpose, and not by mistake
> or accident[;] Kevin Bushrod did so while Zachary Blier was engaged in the
> performance of his official duties[;] [and] at the time Kevin Bushrod did so, he
> knew or had reason to believe that Zachary Blier was a police officer operating and
> authorized to act in the District of Columbia.

Trial Tr. at 131–32, ECF No. 45-1.  To find Bushrod guilty of the greater offense of felony-level

assault while unarmed, the jury had to find the above facts and that Bushrod "committed a

violent act that created a grave risk of causing significant bodily injury to" Officer Blier.  *Id.* at

129.  And to find Bushrod guilty of felony-level assault while armed, the jury had to furthermore

find that "at the time of the offense, Kevin Bushrod was armed with, or had readily available, a

dangerous weapon."  *Id.* at 126.

To prove its case on § 22-405, the prosecution alleged the same set of facts that

Defendants advance here:  that when Officer Blier tried to make an arrest, Bushrod shifted the

car into reverse and pressed the accelerator, and so the car reversed and struck Officer Blier.  *Id.*

at 82–84.  As for the "violent act that caused a grave risk of causing significant bodily injury,"

the prosecution relied on the reversing Crown Victoria that threatened to pin Officer Bushrod

against the Honda CR-V.  *Id.*  For the "dangerous weapon," the prosecution pointed to the

Crown Victoria.  *Id.* at 85.

Bushrod did not testify, but he also did not seek to rebut the bare facts as part of his defense. Defense counsel did not dispute that the car door hit or "clipped" Officer Blier. *See id.* at 98. He explained in his closing arguments that the car "bumped" Officer Blier when Bushrod backed it up, but that Bushrod "didn't even know Officer Blier was there." *Id.* at 99. Counsel likewise accepted the occurrence when probing the testifying officers on exactly *where* the door struck Officer Blier's leg.[13] Conceding that Bushrod was indeed "guilty" of misdemeanor assault on a police officer, the defense instead worked to convince the jury that the car was not a "dangerous weapon" and that any assault did not present a "grave risk of serious bodily injury." *Id.* at 97. These efforts succeeded, as the jury acquitted Bushrod of the two felony-level assault charges and convicted him only of the lesser-included misdemeanor.[14]

To be sure, Bushrod is not bound by every argument and comment—strategic or offhand—made by counsel during his previous trial.[15] But the arguments of counsel and the prosecutor clarify what the jury considered. *See United States v. Uzzell,* 648 F. Supp. 1362, 1365 (D.D.C. 1986) (looking to trial transcripts for "facts revealed and admissions made" in prior

---

[13] For example, counsel asked Officer Blier, "[Y]ou agree that it was the bottom of the door that hit you . . . [i]t sort of caught you in the shin area, didn't it?" Trial Tr. at 33, ECF No. 28-3.

[14] No preclusion results from the jury acquitting Bushrod of felony-level assault on a police officer. *See* Trial Tr. at 16, ECF No. 45-2. All that means is that the jury determined that the evidence presented did not show that Bushrod was guilty *beyond a reasonable doubt* of that offense. But another factfinder could determine by *a preponderance* of the evidence that Bushrod's actions presented a grave threat of serious bodily injury. Bushrod concedes as much. *See* Pl.'s Opp'n at 5.

[15] Defendants have not suggested that judicial estoppel applies here, and for good reason. Counsel's apparent concessions to the jury did not rise to litigation "positions" or "claims," nor would any inconsistency establish that Bushrod actively "misled" this Court or a prior court. *See Moses v. Howard Univ. Hosp.*, 606 F.3d 789, 798–99 (D.C. Cir. 2010) (outlining factors for applying judicial estoppel); *cf. Lassiter*, 447 A.2d at 461 (applying judicial estoppel to bar defendant from advancing different set of facts than those to which he had testified under oath in earlier criminal trial).

criminal case).  In convicting on the misdemeanor charge, the jury must have found that Bushrod

purposefully "assaulted, resisted, intimidated, or interfered with" Blier.  Trial Tr. at 131, ECF

No. 45-1.  And to do so, the jury "had to develop a coherent view of how [Bushrod and Blier]

dealt with each other" during the incident.  *Lassiter*, 447 A.2d at 460.  Both the prosecution and

Bushrod's counsel acknowledged that Bushrod reversed the car and struck Blier.  And—

critically—there were no other factual allegations before the jury for it to find that Bushrod

committed misdemeanor assault of Blier.  Had the jury for some reason rejected the facts that the

parties appeared to agree upon, then it would have had to acquit Bushrod of that misdemeanor

charge too.  "[R]ealism and rationality" compel the conclusion that the jury could not "have

grounded its verdict upon an issue other than that which [Blier] seeks to foreclose from

consideration."  *Ashe*, 397 U.S. at 444.

  As before, Bushrod provides no arguments specifically refuting the collateral estoppel

effects of his misdemeanor assault conviction.  Pl.'s Opp'n at 2–6.  And Defendants have again

met their burden to show that collateral estoppel applies.  A criminal conviction provides

"conclusive proof of the facts supporting the conviction," *Hume*, 680 F. Supp. 2d at 50, and the

jury instructions and trial record show which facts the jury necessarily accepted.  So based on his

conviction for assaulting Blier, Bushrod cannot advance the following assertions that appear in

his complaint:

- that "Bushrod's stalled car was going nowhere, no show of force or arms had come from the Crown Vic, and there was no other actual threat of physical violence," Compl. at 6; and

- that "Bushrod managed to get the car into gear, but before the car moved, Blier fired his gun at Bushrod," *id.* at 7.

  Bushrod's assault conviction also means that he cannot dispute (as he did in his summary

judgment briefing) that the following facts occurred before the shooting:

- that he "place[d] the Crown Victoria in reverse and hit the accelerator," SUMF at 7–8; Pl.'s Facts at 13–14; and

- that "the front door of the Crown Victoria [struck Blier's] left leg," SUMF at 8; Pl.'s at 13–14.

Indeed, through its verdict the jury implicitly found that Bushrod purposefully struck Blier, "not by mistake or accident." Trial Tr. at 131, ECF No. 45-1. But Bushrod may still dispute how hard the door hit Blier and the extent of his injuries and fear as a result. Those details were disputed at Bushrod's trial but not necessarily resolved by the jury's guilty verdict.

### B. The Same Factual Assertions are Precluded under *Heck v. Humphrey*

Blier argues that Bushrod's factual assertions are also barred by *Heck v. Humphrey*, 512 U.S. 477 (1994). Under *Heck*, "a section 1983 damages claim that is based on conduct whose unlawfulness would demonstrate the invalidity of a conviction or sentence is not cognizable unless the conviction or sentence has been invalidated or called into question by issuance of a writ of habeas corpus." *In re Jones*, 652 F.3d 36, 37–38 (D.C. Cir. 2011). The doctrine recognizes that "civil tort actions are not appropriate vehicles for challenging the validity of outstanding criminal judgments." *Taylor v. U.S. Prob. Office*, 409 F.3d 426, 429 (D.C. Cir. 2005). But "*Heck*'s application is limited to suits that, if successful, would necessarily imply the invalidity of the plaintiff's conviction or sentence, *i.e.*, suits challenging the fact or duration of confinement." *Id.* at 427. And the Supreme Court has been "careful . . . to stress the importance of the term 'necessarily'" in concluding that damages actions are barred. *Nelson v. Campbell*, 541 U.S. 637, 647 (2004).

An excessive force claim brought against a police officer for his use of force during an arrest does not necessarily cast doubt on the validity of the arrestee's conviction(s) pertaining to that arrest, so *Heck* does not always bar such a claim. "Even the fact that a defendant was convicted of assault on a police officer does not, under *Heck*, as a matter of law necessarily bar a

§ 1983 claim of excessive force." *Thore v. Howe*, 466 F.3d 173, 180 (1st Cir. 2006) (cleaned up). Rather, courts will permit a § 1983 suit to proceed when the facts could allow both a successful § 1983 suit and the underlying conviction to coexist without contradicting each other. *See Ramos-Ramirez v. Berwick Borough*, 819 F. App'x 103, 106 n.18 (3d Cir. 2020) (collecting cases).

Blier does not suggest that Bushrod's convictions bar the § 1983 claim under the *Heck* doctrine. Rather, as with collateral estoppel, he contends that Bushrod cannot advance certain factual assertions because, if accepted here, they would "demonstrate the invalidity" of the prior convictions. Blier Mot. at 22. For his part, Bushrod does not respond to this argument. He only asserts what Blier concedes: that the *Heck* doctrine does not categorically preclude Bushrod from pursuing his excessive force claim. *See* Pl.'s Opp'n at 2–4.

Blier is correct. Bushrod cannot prevail on his § 1983 claim by relying on any factual allegations that would "necessarily imply the invalidity of" his convictions for destruction of property, leaving the scene after a car collision, fleeing law enforcement, and misdemeanor assault on a police officer. *Taylor*, 409 F.3d at 427. Here, *Heck* bars the same factual assertions as collateral estoppel. Put another way, those facts that would necessarily imply the invalidity of Bushrod's convictions are the same that were "necessary" to his convictions under the collateral estoppel analysis. *See Fenwick*, 926 F. Supp. 2d at 222–23 (determining that there "the outcome demanded by *Heck v. Humphrey* dovetails with the requirements of collateral estoppel").[16] So

---

[16] Although the D.C. Circuit reversed the district court's opinion in *Fenwick*, it did not alter its analysis of *Heck*, and it incorporated the results into its decision. *See Fenwick v. Pudimott*, 778 F.3d 133, 138 (D.C. Cir. 2015).

collateral estoppel aside, the *Heck* doctrine provides an independent basis to limit the factual dispute here.

### C.   Qualified Immunity Bars the Section 1983 Claim Against Blier (Count I)

Bushrod sues Blier under 42 U.S.C. § 1983.[17]  He alleges that the shooting amounted to excessive force, violating his Fourth Amendment right to be secure from unreasonable seizures. *See* Compl. at 11.  Blier denies that the shooting amounted to excessive force under the circumstances.  *See* Blier Mot. at 23–29.

Blier also raises qualified immunity as a defense.  *Id.* at 23.  The doctrine provides that "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  Immunity is warranted for a police officer's actions "if a reasonable officer could have believed that his or her actions were lawful" at the time, "in light of clearly established law and the information the officer possessed."  *Youngbey v. March*, 676 F.3d 1114, 1117 (D.C. Cir. 2012) (cleaned up).  The inquiry turns on the objective legal reasonableness of the official's action, so it is a question of law for the Court.  *Pitt v. District of Columbia*, 491 F.3d 494, 509 (D.C. Cir. 2007).

"Qualified immunity depends upon the answers to two questions: (1) Did the officer's conduct violate a constitutional or statutory right?  If so, (2) was that right clearly established at the time of the violation?"  *Jones v. Kirchner*, 835 F.3d 74, 84 (D.C. Cir. 2016).  Courts may

---

[17]  The statute provides:  "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."  42 U.S.C. § 1983.

answer the questions in either order.  *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009).  So a court "may grant qualified immunity on the ground that a purported right was not 'clearly established' by prior case law, without resolving the often more difficult question whether the purported right exists at all."  *Reichle v. Howards*, 566 U.S. 658, 664 (2012) (quoting *Pearson*, 555 U.S. at 227).  The Court will address both prongs.  Blier prevails on each independently.

### 1.  Officer Blier's Use of Force was Reasonable under the Totality of the Circumstances.

A claim of excessive force turns on the Fourth Amendment's "objective reasonableness" standard, which "tracks the constitutional text by asking whether the force applied was reasonable."  *Johnson v. District of Columbia*, 528 F.3d 969, 973 (D.C. Cir. 2008) (cleaned up). This inquiry "requires a careful balancing of 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake."  *Graham v. Connor*, 490 U.S. 386, 396 (1989) (quoting *Tennessee v. Garner*, 471 U.S. 1, 8 (1985)).

A police officer's "right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it."  *Id.*  Officers are often required to make "split-second judgments" on what force to use in "tense, uncertain, and rapidly evolving" circumstances.  *Id.* at 397.  Assessing the degree of force requires examining "the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."  *Id.* at 396.  But the inquiry remains an objective one, so an officer's subjective intent is irrelevant.  *Wasserman v. Rodacker*, 557 F.3d 635, 641 (D.C. Cir. 2009).

The use of deadly force against a fleeing suspect must pass muster under *Garner* and *Graham*.  "[I]t is unreasonable for an officer to 'seize an unarmed, nondangerous suspect by shooting him dead.'"  *Brosseau v. Haugen*, 543 U.S. 194, 197 (2004) (quoting *Garner*, 471 U.S.

at 11).  But deadly force, such as firing a gun at a suspect, is reasonable where an officer has

"probable cause to believe that the suspect poses a threat of serious physical harm, either to the

officer or to others."  *Garner*, 471 U.S. at 11.  If feasible, an officer should give a warning before

shooting.  *Id.* at 11–12.

When weighing the degree of force used, the Court must pay "careful attention to the

facts and circumstances of each particular case, including the severity of the crime at issue,

whether the suspect poses an immediate threat to the safety of the officers or others, and whether

he is actively resisting arrest or attempting to evade arrest by flight."  *Graham*, 490 U.S. at 396.

This inquiry is necessarily fact-bound, but it does not preclude summary judgment.  Certain

facts, while disputed, may be immaterial to the objective reasonableness of the force.  *See Louis

v. District of Columbia*, 59 F. Supp. 3d 135, 143 n.3 (D.D.C. 2014).  Even where there are

*material* facts in dispute, the Court's task is to "determine[] the relevant set of facts" by

"draw[ing] all inferences in favor of the nonmoving party *to the extent supportable by the

record*," at which point the Court must determine reasonableness as a matter of law.  *Scott v.

Harris*, 550 U.S. 372, 381 n.8 (2007) (emphasis in original); *see also Elshazli*, 415 F. Supp. 3d at

27 (ruling officers entitled to qualified immunity on excessive force claim where video evidence

undermined plaintiff's factual allegations).  After all, qualified immunity is "an immunity from

suit rather than a mere defense to liability," so "it is effectively lost if a case is erroneously

permitted to go to trial."  *Pearson*, 555 U.S. at 232 (reiterating "the importance of resolving

immunity questions at the earliest possible stage in litigation").

For that reason, the parties' submissions are crucial to the Court's analysis.  Under Local

Rule 7(h), a party moving for summary judgment must submit "a statement of material facts as

to which the moving party contends there is no genuine issue, which shall include references to

the parts of the record relied on to support the statement." Defendants did so. *See* SUMF at 2–17; District of Columbia's Mot. for Summ. J. Ex 3, at ECF No. 29-3. The rule also requires a party opposing summary judgment to submit "a separate concise statement of genuine issues setting forth all material facts as to which it is contended there exists a genuine issue necessary to be litigated, which shall include references to the parts of the record relied on to support the statement." LCvR 7(h). The Court's Standing Order repeats this instruction. *See* Standing Order ¶ 14(B)(i), ECF No. 3. It states that a party opposing summary judgment "must, in turn, submit a statement enumerating all material facts which the party contends are genuinely disputed and thus require trial." *Id.*

Bushrod did not do so.[18] While he explicitly disputed many assertions made by Defendants in their filings, his submission does not include a "statement enumerating all material facts which the party contends are genuinely disputed." *Id.* Bushrod identified some "additional facts in dispute," but many are unsupported by citations to the record or address immaterial issues.[19] This leaves the Court shorthanded. It is not the Court's role to "sift and sort through the record" to identify possible material disputed issues that would preclude summary judgment. *Jackson v. Finnegan, Henderson, Farabow, Garrett & Dunner*, 101 F.3d 145, 153 (D.C. Cir. 1996). The Court's rules operate to avoid such a situation, and the local rule "embodies the

---

[18] Bushrod's submission references the Court's Standing Order and reflects an attempt to comply with it. *See* Pl.'s Facts at 1. But the Order also states: "The parties are strongly encouraged to carefully review *Jackson v. Finnegan, Henderson, Farabow, Garrett & Dunner*, 101 F.3d 145 (D.C. Cir. 1996)." Standing Order ¶ 14(B)(i), ECF No. 3. That opinion spells out how parties should present a statement of genuine disputed material issues. *See Jackson*, 101 F.3d at 153–54.

[19] For example, Bushrod's facts assert that Blier "lost his temper," "moved in anger," and "was completely unhinged." Pl.'s Facts at 32. These disputed "facts" lack citations to evidence. Nor would peering into Blier's amygdala aid the Court in determining what "a reasonable officer on the scene" would have experienced. *Graham*, 490 U.S. at 396.

thought that judges 'are not like pigs, hunting for truffles buried in briefs' or the record." *Potter*

*v. District of Columbia*, 558 F.3d 542, 553 (D.C. Cir. 2009) (Williams, J., concurring) (quoting

*United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991) (per curiam)).  The Court will forge

ahead and determine the relevant set of facts, which establish that no constitutional violation

occurred.  But this might have been a closer case had Bushrod submitted a well-supported list of

material disputed facts.

Assessing the "reasonableness" of the shooting requires examining "the perspective of a

reasonable officer on the scene." *Graham*, 490 U.S. at 396.  So the Court will—after making all

supportable inferences in Bushrod's favor—determine the relevant set of facts, with a focus on

what a reasonable officer in Blier's position would have experienced.

The officers began following Bushrod based on his expired registration.  SUMF at 2–3;

Pl.'s Facts at 5–6.  They had arrested Bushrod several weeks earlier for operating the same car

without a valid license or valid registration.[20]  *Id.*  Bushrod rebuffed the officers' initial attempt

to carry out a safe traffic stop.  Instead, as the jury found, Bushrod purposefully fled from the

officers and drove recklessly through rush-hour traffic, ultimately hitting another car in an

intersection.  *See supra* at III.A.1 and III.A.2.  Blier and Collins surrounded his car with their

guns drawn, and Blier shouted at Bushrod to get out of the car.  SUMF at 6; Pl.'s Facts at 11.

---

[20]  The parties dispute what Blier knew at the time of the incident about Bushrod's criminal history.  *See* D.C. Mem. at 10; Pl.'s Facts at 2–3, 6–7.  The District contends that Blier must have known about Bushrod's prior conviction for unlawful possession of a firearm because he had searched his criminal history on several occasions before the shooting.  *See* District of Columbia's Reply in Support of its Mot. For Summ. J. at 11, ECF No. 29.  More, it seems exceedingly unlikely that the officers would have forgotten what they assuredly would have learned at Bushrod's prior arrest:  that he had a felony conviction for unlawful gun possession.  This is especially true if Bushrod is correct that these officers had been "targeting" him since his first arrest.  *See* Pl.'s Facts at 29–30.  Nonetheless, the Court will indulge the supposition that Blier knew nothing about Bushrod's criminal history beyond the arrest he participated in several weeks earlier.

Blier opened Bushrod's door and reached inside.  SUMF at 7; Pl.'s Facts at 12.  A struggle

ensued.  *Id.*  Bushrod pressed his foot down on the accelerator reversing the car, purposefully

striking Blier with his door and propelling him backward toward the Honda CR-V.[21]  *See* SUMF

at 8; *supra* at III.A.2 and III.A.3.  Without first giving a warning,[22] Blier fired once at Bushrod

who was still in the driver's seat, striking him in the back.  SUMF at 9–10; Pl.'s Facts at 16–17.

Blier's actions were reasonable under *Garner* and *Graham*.  *First*, Bushrod engaged in

dangerous, felony-level misconduct as he fled from the officers.[23]  To be sure, the officers pulled

Bushrod over because his car lacked registration, and their previous encounter—when they

arrested him for the same conduct—was not dangerous.  *See* Pl.'s Facts at 2–4.  But the situation

on this day soon escalated because of Bushrod's decision to flee.  And he piled up dangerous and

arrestable offenses as he evaded the police.  *See Monzon v. City of Murrieta*, 978 F.3d 1150,

1157 (9th Cir. 2020) (determining "severity" of crime at issue supported use of deadly force

where suspect led officers on dangerous car chase and refused to surrender, even after his car

was surrounded); *cf. Hedgpeth v. Rahim*, 213 F. Supp. 3d 211, 224 (D.D.C. 2016) (characterizing

suspect's offenses as "minor" crimes under *Graham* because they were misdemeanors and

officers did not initially seek to arrest suspect for them), *aff'd*, 893 F.3d 802 (D.C. Cir. 2018).

Bushrod's precise speed in fleeing from the officers remains uncertain, but that he drove

recklessly and endangered others is not.  So while the officers did not initially pursue Bushrod

---

[21]  In convicting Bushrod of assault, the jury necessarily found that he assaulted Blier "voluntarily, on purpose, and not by mistake or accident."  Trial Tr. at 131, ECF No. 45-1.

[22]  Neither party in their briefing mentions the presence or absence of an explicit warning by Blier that he might fire.  Bushrod does, however, state in his complaint that the shot came "without warning."  Compl. at 7.  The Court will assume this fact in Bushrod's favor.

[23]  The record confirms that at least one destruction of property conviction and the fleeing from police offense were felonies.  *See* Trial Tr. at 18, ECF No. 45-2.

for a "violent" crime, *Garner*, 471 U.S. at 21, his offenses and conduct were indeed "dangerous" by the time of the shooting, *id.* at 20–21.

*Second*, Bushrod was "actively resisting arrest [and] attempting to evade arrest by flight" before, during, and after the shooting. *Graham*, 490 U.S. at 396. In fact, at his criminal trial Bushrod's defense to the assault charge was that he was (merely) trying to resist arrest and flee. *See* Trial Tr. at 97, ECF No. 45-1. More, Blier and Bushrod were engaged in a physical struggle moments before the shooting.

*Third*, and most importantly, Bushrod "pose[d] an immediate threat to the safety of the officers [and] others." *Graham*, 490 U.S. at 396. Bushrod's conduct did not merely *risk* injuring others; by the time of the shooting he had struck one occupied car (the Honda CR-V) and one person (Blier). When the officers approached Bushrod with their guns drawn, his response was to try to maneuver the car yet again and resume his flight. He was, apparently, also undeterred by a police officer yelling at him to stop or by physically struggling with the armed officer. Behind the wheel of a powerful sedan, Bushrod threatened the safety of officers and innocent bystanders, giving a reasonable officer a compelling reason to end the encounter. After all, "the law does not require officers in a tense and dangerous situation to wait until the moment a suspect uses a deadly weapon to act to stop the suspect." *Wallace v. District of Columbia*, 685 F. Supp. 2d 104, 111 (D.D.C. 2010); *accord Long v. Slaton*, 508 F.3d 576, 581 (11th Cir. 2007) (concluding that stationary car posed deadly threat); *see also Brosseau*, 543 U.S. at 200 (acknowledging that "a car can be a deadly weapon").

The Court assumes that Blier gave no explicit warning before firing. But this omission is not determinative. Officers must give a warning "where feasible." *Garner*, 471 U.S. at 11–12. When the chaotic nature of the situation and an immediate threat to the safety of one or more

26

individuals justifies deadly force, it may often be infeasible to give a warning and wait for it to

be heeded (or not).  And here, Bushrod already knew of Blier's presence and intent to stop his

flight.  He had ignored the officers' signal to stop and even physically struggled over the keys in

the car, with Blier yelling at Bushrod while brandishing a gun.  A reasonable officer could

conclude that a more formal vocal warning about how the gun might be used would add very

little compared to what could happen during the delay such a warning would require.

Unlike an officer in the heat of the moment, the Court can dissect the incident at its

leisure and evaluate the actions of Bushrod and Blier piecemeal when weighing the

reasonableness of the use of force.  And it has.  But the Court must look ultimately to the totality

of the circumstances.  *See Graham*, 490 U.S. at 396.  The Court is mindful that Blier did not

encounter words on a page; he faced a suspect who appeared determined to resume his reckless

flight and put others at risk even after striking a police officer with his car.  Bushrod's actions

left Blier precious little time—really, no time at all—to make a "split-second judgment" in this

"tense, uncertain, and rapidly evolving" encounter.  *Id.* at 397.  For the Court to rule that Blier's

shot was unreasonable, it would have to ignore the chaotic nature of the situation in favor of the

verboten "20-20 vision of hindsight."  *Graham*, 490 U.S. at 396.  Under the totality of the

circumstances, the force was reasonable.

Recent case law confirms this.  In *Plumhoff v. Rickard*, the Supreme Court determined

that police officers' actions were objectively reasonable when they shot at a fleeing motorist.

572 U.S. 765, 777–78 (2014).  The officers at first pulled over the car for a broken headlight.  *Id.*

at 768.  When asked to get out of the car, Rickard drove off and led police on a high-speed chase

through traffic.  *Id.* at 769.  During the flight, he caused "contact to occur" between his car and

police cruisers several times.  *Id.*  He eventually came to halt in a parking lot while surrounded

by police cars.  *Id.*  The Court explained:

> Now in danger of being cornered, Rickard put his car into reverse in an attempt to
> escape.  As he did so, Evans and Plumhoff got out of their cruisers and approached
> Rickard's car, and Evans, gun in hand, pounded on the passenger-side window.  At
> that point, Rickard's car made contact with yet another police cruiser.  Rickard's
> tires started spinning, and his car was rocking back and forth, indicating that
> Rickard was using the accelerator even though his bumper was flush against a
> police cruiser.  At that point, Plumhoff fired three shots into Rickard's car.  Rickard
> then reversed in a 180 degree arc and maneuvered onto another street, forcing Ellis
> to step to his right to avoid the vehicle.  As Rickard continued fleeing down that
> street, Gardner and Galtelli fired 12 shots toward Rickard's car, bringing the total
> number of shots fired during this incident to 15.

*Id.* at 769–70 (internal citations and quotations omitted).

The Court determined that all 15 shots were objectively reasonable under the Fourth

Amendment.  *Id.* at 776.  "Rickard's outrageously reckless driving posed a grave public safety

risk."  *Id.*  When the officers opened fire the only thing "a reasonable police officer could have

concluded was that Rickard was intent on resuming his flight and that, if he was allowed to do

so, he would once again pose a deadly threat for others on the road."  *Id.* at 777.

So too for Blier.  To rule otherwise, the Court would have to distinguish the reckless

driving in *Plumhoff* by such uncertain factors as the speed of the flight and the number of

"contacts" the drivers made with other vehicles—all while ignoring that a mere risk of harm that

justified 15 shots in *Plumhoff* actually occurred here when Bushrod struck Blier with his car and

continued fleeing.

Even if Blier's single shot was less reasonable than the 15 shots in *Plumhoff*, the Supreme

Court did not suggest that the police conduct there was even near the line of unreasonableness.

Rather, the unanimous Court held that it was "beyond serious dispute" that "the police acted

reasonably in using deadly force to end" Rickard's flight.  *Id.* at 777.  More, the Court in

28

*Plumhoff* noted that it had the discretion to dismiss the plaintiff's claims as failing to articulate a clearly established right at issue, but it chose to address the constitutional question anyways to "promote[] the development of constitutional precedent" in this area. *Plumhoff*, 572 U.S. at 774; *see also Mullenix v. Luna*, 577 U.S. 7, 15 (2015) (noting that the Supreme Court has "never found the use of deadly force in connection with a dangerous car chase to violate the Fourth Amendment, let alone to be a basis for denying qualified immunity").[24]  As it must, the Court here falls in line with that precedent.

Or take the remarkably similar circumstances in *Martin for Estate of Webb v. City of Newark*, 762 F. App'x 78 (3d Cir. 2018).  There, an officer shot an unarmed suspect sitting in the driver's seat of a stationary car moments after "the two engaged in a struggle at the open driver's side door." *Id.* at 83.  The Third Circuit determined that the officer's three shots were objectively reasonable, explaining that he "was faced with an erratic and noncompliant driver who disregarded his explicit warning not to start the car, despite [his] proximity to, and presence (of at least his hands) within, the vehicle." *Id.*  The suspect "posed a threat to [the officer]'s life: being injured by a moving vehicle," so he "need not have awaited movement of the car to protect himself." *Id.*

Blier also faced an "an erratic and noncompliant driver" who disregarded warnings and posed a threat by his "bold actions" behind the wheel. *Id.*  The Third Circuit assumed that the officer gave a warning specifically about using his gun, *see id.*, while here the Court assumes that Blier did not.  But unlike the suspect in *Martin*, Bushrod had shown how he would use the car: recklessly operating it on busy streets and refusing to cease his flight even after hitting

---

[24]  The Supreme Court has not since found a Fourth Amendment violation involving the use of deadly force following a car chase.

another car and an officer.  A reasonable officer in Blier's shoes thus had even more reason to fear.

While some facts here remain disputed, none of them alter the constitutionality of the use of force.  Chief among them are the precise position of Blier relative to Bushrod's car at the time of the shot, and in what direction the car was moving.  Blier says that as he lay against the Honda CR-V after being struck by the Crown Victoria, he fired because he was afraid of being crushed or trapped by the car reversing toward him.  SUMF at 9.  Bushrod contends that the Crown Victoria must have been moving forward and *away* from Blier at the time of the shot.  Pl.'s Facts at 17–18.  If Blier is correct, courts have repeatedly confirmed as reasonable the use of deadly force when a suspect's moving car threatens an officer on foot.[25]

If the car was instead moving away, this case still falls under *Plumhoff*.  There, the Court held that the officers' 12 shots (after the initial three) were reasonable, even though the officers fired upon a car that was driving away from the officers.  *Plumhoff*, 572 U.S. at 770.[26]  The

---

[25] *See, e.g.*, *Vann v. City of Southaven, Mississippi*, 884 F.3d 307, 310 (5th Cir. 2018) (per curiam) (ruling deadly force reasonable where it was "undisputed that [the officer] shot [the suspect] after his colleague, [another officer], was knocked to the ground by [the suspect]'s car and as [the] car approached [the other officer] for a second time"); *Clark v. Bowcutt*, 675 F. App'x 799, 810 (10th Cir. 2017) (finding deadly force reasonable where it was "beyond peradventure that [the suspect] was making hostile motions with his weapon—i.e., his car— toward Deputy Bowcutt"); *McCullough v. Antolini*, 559 F.3d 1201, 1207 (11th Cir. 2009) ("We have . . . consistently upheld an officer's use of force and granted qualified immunity in cases where the decedent used or threatened to use his car as a weapon to endanger officers or civilians immediately preceding the officer's use of deadly force."); *Robinson v. Arrugueta*, 415 F.3d 1252, 1254, 1256 (11th Cir. 2005) (shooting justified where officer fired on car moving toward him "at a likely speed of around one to two miles per hour" because "reasonable officer could have perceived that [suspect] was using the [car] as a deadly weapon").  The D.C. Circuit's decision in *Fenwick v. Pudimott*, 778 F.3d 133 (D.C. Cir. 2015) is not to the contrary.  There the panel merely determined that constitutionality of the force was "far from obvious," so it declined to decide it.  *Id.* at 137.

[26] The district court's opinion in *Plumhoff* confirms this detail more explicitly.  *See Estate of Allen v. City of W. Memphis*, No. 05-2489, 2011 WL 197426, at *3 (W.D. Tenn. Jan. 20, 2011)

Court noted that the threat to public safety was ongoing, even though the suspect's car "came to a temporary standstill" when the officers began shooting.  *Id.* at 777.  Other courts have likewise found even a stationary car to pose a deadly threat.[27]  Blier and Collins faced a dynamic situation with an ongoing threat from Bushrod's driving.  A reasonable officer would not have believed that the threat had ended when the Crown Victoria struck Blier—no matter the precise speed and direction it was moving at the time of the shot.

Bushrod spends several pages attacking Blier's record and his motives in pursuing him that day.  *See* Pl.'s Facts at 28–34.  Those disputed facts are immaterial here.  An officer's subjective intent is irrelevant to the objective reasonableness of the use of force.  *Wasserman*, 557 F.3d at 641.  Bushrod advances no other disputed facts material to the constitutionality of the use of force.  *See* Pl.'s Facts at 28–36.

Taking all supportable inferences in favor of Bushrod, the Court has assumed a set of facts about what occurred before and during the shooting.  Under the totality of those circumstances, Blier's use of force was objectively reasonable.

---

("Gardner fired all ten shots while the vehicle was moving forward (i.e., away from the officers) . . . .  Galtelli also fired two shots at the vehicle . . . [as the suspect] was fleeing down Jackson Avenue.").

[27] *See, e.g.*, *Martin*, 762 F. App'x at 83 (determining that officer reasonably shot driver in the back "even assuming the car had not yet moved at the time of the shooting"); *Long*, 508 F.3d at 581 (11th Cir. 2007) ("Even if we accept that the threat posed by Long to Deputy Slaton was not immediate in that the cruiser was not moving toward Slaton when shots were fired, the law does not require officers in a tense and dangerous situation to wait until the moment a suspect uses a deadly weapon to act to stop the suspect."); *Pace v. Capobianco*, 283 F.3d 1275, 1282 (11th Cir. 2002) (concluding that officers did not use excessive force in shooting at suspect who had stopped his car "for, at most, a very few seconds" after a high-speed chase).

**2.  Even if the Use of Force was Unreasonable, Bushrod Failed
to Plead and Show a Violation of Clearly Established Law.**

Blier prevails for an independent reason.  Even if Blier used excessive force, Bushrod has

failed to show a violation of a right that was clearly established at the time of the incident.

Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the

law."  *Malley v. Briggs*, 475 U.S. 335, 341 (1986).  So immunity applies unless the unlawfulness

of an official's conduct was "clearly established at the time" of its occurrence.  *District of

Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018).  "Clearly established" means "that, at the time of

the officer's conduct, the law was sufficiently clear that every reasonable official would

understand that what he is doing is unlawful."  *Id.* (cleaned up).

A legal principle is clearly established only if it has a "sufficiently clear foundation in

then-existing precedent."  *Wesby*, 138 S. Ct. at 589.  "While there does not have to be a case

directly on point, existing precedent must place the lawfulness of the particular action beyond

debate."  *City of Escondido v. Emmons*, 139 S. Ct. 500, 504 (2019) (per curiam) (cleaned up).  It

is "not enough that the rule is suggested by then-existing precedent."  *Wesby*, 138 S. Ct. at 590.

The rule must be "settled law," meaning dictated by "controlling authority" or "a robust

consensus of cases of persuasive authority."  *Id.* at 589–90 (cleaned up).  There remains,

however, an exception for the "obvious case" where a violation is sufficiently clear even without

precedent addressing similarly circumstances.  *Brosseau*, 543 U.S. at 199.

Plaintiffs bear the burden to show that a right in question was clearly established.  *Dukore

v. District of Columbia*, 799 F.3d 1137, 1145 (D.C. Cir. 2015).  More, they must define the

clearly established right with specificity.  *Emmons*, 139 S. Ct. at 503.  The Supreme Court "has

repeatedly told courts . . . not to define clearly established law at a high level of generality."

*Kisela*, 138 S. Ct., at 1152 (internal quotation marks omitted).

32

This precision is "particularly important" in excessive-force cases.  *Emmons*, 139 S. Ct. at 503.  "Use of excessive force is an area of the law in which the result depends very much on the facts of each case, and thus police officers are entitled to qualified immunity unless existing precedent squarely governs the specific facts at issue."  *Kisela v. Hughes*, 138 S. Ct. 1148, 1153 (2018) (per curiam) (cleaned up).  For deadly force, "the general rules set forth in *Garner* and *Graham* do not by themselves create clearly established law outside an 'obvious case.'"  *Id.*

Blier raised qualified immunity in his motion for summary judgment.  Blier Mot. at 23–29.  He need not have done more to shift the burden to Bushrod, yet he did.  He identifies several similar cases in which appellate courts found an officer's use of deadly force reasonable.  *See id.* at 24–25.  More, he contends that the lack of a clearly established right is apparent from *Fenwick*.  *See Fenwick*, 778 F.3d at 138 (concluding that right not clearly established where officers opened fire on suspect fleeing in car who "posed no immediate threat to either officers or bystanders" but who had created "a grave risk of causing significant bodily injury" to an officer just moments beforehand).[28]

For his part, Bushrod is nearly silent on the "clearly established" prong of qualified immunity.  His opposition brief offers one drive-by citation to *Tennessee v. Garner* for the proposition "that that the Fourth Amendment prohibits the use of deadly force to seize a non-dangerous fleeing felon."  Pl.'s Opp'n at 7 (citing *Garner*, 471 U.S. at 10).  Otherwise, he briefly distinguishes *Fenwick* on the ground that in that case the "suspect who clipped an officer with his

---

[28]  Although the events at issue in *Fenwick* occurred in 2007, the D.C. Circuit handed down its decision in 2015.  So even if the court had decided that the use of force was unconstitutional—a question it explicitly did not reach—the decision could not have clarified the law for Blier, who shot Bushrod in 2014.

car had done so intentionally," *id.*, with the unstated presumption presumably being that Bushrod did not.[29]  Bushrod's arguments end there.[30]

Bushrod bore the burden to identify a clearly established right.  *Dukore*, 799 F.3d at 1145.  He failed to attempt that lift.  Had he done so, he could have tried to show such a right in one in two ways.  *First*, by identifying a "controlling authority" or "a robust consensus of cases of persuasive authority."  *Wesby*, 138 S. Ct. at 590 (cleaned up).  But the closest controlling authority works against Bushrod.  *See Plumhoff*, 72 U.S. 769–70.[31]  And as explained above, so do persuasive authorities.  *See supra* at notes 25 & 27.  *Second*, absent relevant case law, Bushrod could have showed that the constitutional violation was "obvious."  *Brosseau*, 543 U.S. at 199.  Having explained above why no violation occurred at all, the Court will not belabor the point here.

In sum, Bushrod has at the very least failed to meet his burden to show that Blier's shot violated a clearly established right.  He did not define the alleged right with enough specificity, *see Emmons*, 139 S. Ct. at 503, because he did not define it at all.  Qualified immunity applies.

---

[29]  Recall that this contention contradicts the jury's finding that Bushrod was guilty of assaulting Blier, which required finding that he acted "voluntarily, on purpose, and not by mistake or accident."  Trial Tr. at 131, ECF No. 45-1.

[30]  Bushrod's complaint does not come to the rescue.  Its only statement on the issue provides: "[Blier's] acts and omissions violated clearly established rights of Mr. Bushrod of which a reasonable officer should have known, and constituted the use of force sufficiently excessive to overcome . . . Officer Blier's qualified immunity from Fourth Amendment liability within the meaning of *Graham v. Connor*, 490 U.S. 386, 396 (1989)."  Compl. at 10.

[31]  Nor is there any reason to think a right became clearly established in the four months between the Supreme Court's decision in *Plumhoff* and the incident in this case.

### D.  Qualified Privilege Bars the Assault and Battery
### Claim Against Blier and the District (Count II)

Bushrod next contends that Blier committed common law assault and battery.  *See*

Compl. at 11–12.  Under D.C. law, an assault is "an intentional and unlawful attempt or threat,

either by words or acts, to do physical harm to the victim."  *Etheredge v. District of Columbia*,

635 A.2d 908, 916 (D.C. 1993).  A battery is an "intentional act that causes harmful or offensive

bodily contact."  *Id.* (cleaned up).  The District is vicariously liable for the intentional and

negligent acts of its officers when they act within the scope of their employment.  *Evans-Reid v.*

*District of Columbia*, 930 A.2d 930, 937 (D.C. 2007).

Neither Defendant argues in the summary judgment briefing that the elements of assault

and battery have not been met.  Rather, "[a]s in most cases involving intentional shootings by

police officers . . . the issue of liability turns on the defense of privilege."  *Id.*  "A police officer

has a qualified privilege to use reasonable force to effect an arrest, provided that the means

employed are not 'in excess of those which the actor reasonably believes to be necessary.'"

*Etheredge*, 635 A.2d at 916 (quoting *Jackson v. District of Columbia*, 412 A.2d 948, 956 (D.C.

1980)).  "Moreover, any person, including an officer, 'is justified in using reasonable force to

repel an actual assault, or if he reasonably believes he is in danger of bodily harm.'"  *Id.* (quoting

*Johnson v. Jackson*, 178 A.2d 327, 328 (D.C. 1962)).  "Use of 'deadly force,' however, is lawful

only if the user actually and reasonably believes, at the time such force is used, that he or she (or

a third person) is in imminent peril of death or serious bodily harm."  *Id.*

To evaluate whether qualified privilege applies, "District of Columbia courts use the

same objective reasonableness standard applicable to qualified immunity under § 1983."

*Wallace*, 685 F. Supp. 2d at 112 (dismissing assault claim against officers and city based on

qualified privilege after determining that qualified immunity applied to § 1983 claim); *see also*

*Etheredge*, 635 A.2d at 916 & n.10 (applying objective reasonableness standard of *Graham*, which "reflects a realistic recognition of the perils of police work" that "does not turn on the forum in which the plaintiff subsequently seeks redress"); *Evans-Reid*, 930 A.2d at 945 n.23 (explaining that because "the evidence admitted is insufficient to overcome the defense of privilege to a claim of assault and battery, it would be similarly insufficient in the context of an immunity defense to a constitutional claim").

Bushrod does not contest that the applicability of qualified privilege tracks the qualified immunity analysis. In fact, his brief does not mention "qualified privilege" at all. *See* Pl.'s Opp'n at 1–11. As in *Wallace*, Blier is "privileged from tort liability for the same reasons [he is] immune from constitutional liability." 685 F. Supp. 2d at 112. So the Court must reject the assault and battery claim against Defendants. *See id*; *see also Jenkins v. District of Columbia*, 223 A.3d 884, 900 (D.C. 2020) (noting that the District "may avoid vicarious liability for what would otherwise be common-law assault and battery by a police officer" if "the conduct was constitutional"); *Evans-Reid*, 930 A.2d at 937–42 (affirming dismissal of assault claim against District after determining that qualified privilege applied to police officer's shooting).

**E. The Claim of Intentional Infliction of Emotional Distress Against Blier and the District of Columbia (Count III) Fails Because Blier's Conduct was not Extreme or Outrageous**

Bushrod also brings a claim of intentional infliction of emotional distress against Blier and the District based on the shooting. *See* Compl. at 12. The elements of intentional infliction of emotional distress consist of (1) "extreme and outrageous" conduct on the part of the defendant, which (2) intentionally or recklessly (3) causes the plaintiff "severe emotional distress." *See Waldon v. Covington*, 415 A.2d 1070, 1076 (D.C. 1980); Restatement (Second) of Torts § 46 (1965). As to the first element, the conduct must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as

atrocious, and utterly intolerable in a civilized community." *Kowalevicz v. United States*, 302 F. Supp. 3d 68, 76 (D.D.C. 2018) (citing *District of Columbia v. Tulin*, 994 A.2d 788, 800 (D.C. 2010)); *see* Restatement § 46, cmt. d. The factfinder may infer the existence of the second element—intent or recklessness—from the very outrageousness of a defendant's conduct. *See Waldon*, 415 A.2d at 1077. "Finally, the defendant's actions must proximately cause the plaintiff emotional distress of so acute a nature that harmful physical consequences might be not unlikely to result." *Kotsch v. District of Columbia*, 924 A.2d 1040, 1046 (D.C. 2007) (cleaned up). Whether the conduct complained of is sufficiently outrageous is a question of law for the Court to decide. *Kowalevicz*, 302 F. Supp. 3d 68 at 76.

The "'extreme and outrageous' standard for intentional infliction of emotional distress is different from, and more exacting than, the 'reasonableness' standard used for evaluating claims of excessive force." *Kotsch*, 924 A.2d at 1046 n.5. So Defendants argue that, having failed to show that Blier's conduct was objectively unreasonable, Bushrod has also failed to establish that it was "extreme and outrageous." Blier Mot. at 29–30; D.C. Mem. at 13–14. Courts have agreed with this reasoning when considering police officers' use of force. *See, e.g.*, *Stevens v. Stover*, 727 F. Supp. 668, 672–73 (D.D.C. 1990) (rejecting claim for intentional infliction of emotional distress because court found force used by officer was reasonable when assessing § 1983 claim); *Williams v. Park Place Inc.*, No. 16-cv-1931 (RJL), 2019 WL 6877923, at *7 n.4 (D.D.C. Dec. 16, 2019) (concluding that claim of intentional infliction of emotional distress "would similarly fail because . . . the force employed by [the officer] was not unreasonable").

Bushrod does not respond to this. His summary judgment brief does not mention Defendants' arguments here or "intentional infliction of emotional distress" at all. *See* Pl.'s Opp'n at 1–11. He thus concedes the argument. *See Wannall v. Honeywell, Inc.*, 775 F.3d 425,

428 (D.C. Cir. 2014) (explaining that when an opposition to a motion for summary judgment "addresses only some of the movant's arguments, the court may treat the unaddressed arguments as conceded").  Blier's conduct was not unreasonable, and it was therefore not "extreme and outrageous" either.  *Kotsch*, 924 A.2d at 1046 n.5.  Bushrod's claim for intentional infliction of emotional distress fails.

## IV.  CONCLUSION

Bushrod's shooting and his resulting injuries are tragic.  But his criminal, dangerous, and assaultive conduct in the moments before the shooting are to blame.  Blier and the District cannot be held responsible for the results of Bushrod's misconduct.  The Court will grant Defendants' motions for summary judgment.  A separate Order will issue.


Dated:  February 22, 2021                              _____
                                                       TREVOR N. McFADDEN, U.S.D.J.